In re Richard L. MIDDLETON,
Bankrupt.

James R. LEONARD, Jr., Trustee,
Plaintiff,

v.

The COMMONWEALTH NATIONAL
BANK and the Redevelopment Authority of the County of Lancaster, Defendants.

Bankruptcy No. 78–1932 TT.

United States Bankruptcy Court,
E. D. Pennsylvania.

April 23, 1980.

James R. Leonard, Jr., Jon M. Gruber, Lancaster, Pa., for trustee.

Lawrence E. Stengel, Lancaster, Pa., for The Redevelopment Authority of the County of Lancaster.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

The matter presently before this Court concerns the application and complaint by the trustee in bankruptcy to sell two parcels of real estate free and clear of all liens and encumbrances.[1]

The two properties involved were acquired by the bankrupt, Richard L. Middleton, pursuant to an agreement with the defendant, Redevelopment Authority of the County of Lancaster. The agreement of sale provided that the Redevelopment Authority would convey to the bankrupt two parcels of real estate in the Borough of Columbia, Lancaster County, Pennsylvania, located at 329 North Third Street and 213 Perry Street, respectively. In consideration for the Authority's execution of the deed to the two properties, the bankrupt agreed to pay $6,150 in cash and also promised to rehabilitate the two properties in accordance with specifications provided by the Authority and would sell the properties to buyers "approved by the Authority" at prices set by the Authority. (Agreement of Sale, p. 2, Exhibit B.) Item 7 on page 2 of the agreement of sale establishes these

prices as $18,500 for the North Third Street property and $15,500 for the Perry Street property. These covenants were incorporated into the February 3, 1978 deed of sale by a paragraph which reads:

> the terms and conditions of the Agreement of Sale dated January 25, 1978, between Grantor and Grantee herein to be kept and performed by the Grantee herein shall survive the herein conveyance and shall remain binding on the Grantee herein until the completion of the rehabilitation work described in the aforementioned Agreement of Sale.

Deed of Conveyance, p. 2 (Exhibit "A" to the complaint).

The Agreement of Sale also required that the bankrupt (called the "Rehabilitator" in the Agreement of Sale) grant the Authority a mortgage against the two properties.

> A non-interest bearing mortgage, which will be subordinated to construction financing of Rehabilitator, will be placed against the properties in favor of the Authority in principal amounts equal to the difference between selling price as fixed in paragraph 6 [*sic*] and the market value of the property after rehabilitation as determined by the Authority. Said mortgage will remain a lien against said property until five years after Rehabilitator makes final settlement with buyer approved by the Authority.

Agreement of Sale, para. 6, p. 1 (Exhibit "B" to the Complaint). Pursuant to this provision, two mortgages of $5,000 each were duly recorded (in favor of the Authority), each mortgage encumbering one of the two properties. These mortgages are subordinate to a mortgage against both properties in the amount of $23,800, in favor of the Commonwealth National Bank. The amount of the two mortgages is determined by the use of a formula employed by the Authority which is based on the difference between the selling price established by the Authority and the projected fair market value of the property after completion of all

---

1. This Opinion constitutes the findings of fact and conclusions of law required by Bankruptcy Rule 752.

rehabilitation work. Notes of Testimony at 24–27 [hereinafter cited as N.T.] (Testimony of Drew Myers, Assistant Program Director for the Authority).

The purpose of the mortgage in favor of the Authority is to secure the rehabilitator's performance of all the covenants. (N.T. 26.) The agreement between the Authority and the bankrupt is a means of implementing a publicly funded program aimed at rehabilitating community housing which is in a state of disrepair. The Authority is authorized to seek out and purchase rundown properties and to sell them to developers at a substantial mark-down, if the developer agrees to perform the needed repairs specifically outlined by the Authority, and then to sell to approved buyers at prices set by the Authority. (N.T. 24.)

The bankrupt in the case at bar, a self-employed builder, had completed a substantial portion of the repairs which he had covenanted to perform when he filed a voluntary petition in bankruptcy on December 29, 1978.

The trustee for the bankrupt, who was appointed on February 6, 1979, filed a complaint in July, 1979, for leave to sell the North Third Street and Perry Street properties free and clear of liens and encumbrances. Copies of said complaint were served upon both mortgagees—the Redevelopment Authority and the Commonwealth National Bank. Neither the Bank nor the Authority filed an answer. At the October 16, 1979 hearing on the matter, only the Authority made an appearance to oppose the trustee's request.

In order to resolve this controversy, the Court must address three major issues: 1) Does § 70b of the Bankruptcy Act relieve the trustee of his obligation, as inherited from the bankrupt, to complete the rehabilitation of the two properties involved? 2) If so, does rejection by the trustee of the executory contract render the mortgage obligation securing the bankrupt's performance invalid? 3) Finally, regardless of whether the Authority's "security" entitles it to be paid out of proceeds from any sale of the two properties, will sufficient pro-

ceeds be realized so as to provide any fund for distribution to general, unsecured creditors?

First, § 70b of the Bankruptcy Act provides that the trustee shall have the power to assume or reject any contract to which the bankrupt was a party, which, at the time of the filing of the petition, was executory "in whole or in part." "As long as there remains any part of a contract unperformed, the contract is executory." 4A *Collier on Bankruptcy* § 70.43[22] at 522 (14th ed. 1978); *In re Universal Medical Services, Inc.*, 325 F.Supp. 890, 891 (E.D.Pa.1971), *aff'd*, 460 F.2d 524 (3d Cir. 1972).

The bankrupt has not performed all of the covenants in the January 25, 1978 agreement. Neither of the properties has yet been sold (although the Authority has selected a buyer for the North Third Street property). Both parties agree that some rehabilitation work still remains to be done on both properties. (N.T. 16–17, 32.) Thus, the agreement signed by the bankrupt and defendant Redevelopment Authority on January 25, 1978, is within the definition of executory contract. Though the Authority has performed in full, the performance of the bankrupt is incomplete.

The "underlying principle . . . [of Section 70b] is that the trustee in bankruptcy may abandon burdensome property and reject unprofitable executory contracts in order to further the best interests of the estate." *In re New York Investors Mutual Group, Inc.*, 143 F.Supp. 51, 54 (S.D.N.Y. 1956).

■ The procedure for the trustee's exercise of his power to assume or reject executory contracts in straight bankruptcy proceedings is governed by Bankruptcy Rule 607, which supersedes the first four sentences of § 70b. *See* Advisory Committee Note following Rule 607. Assumption of an executory contract must be express, and must then be approved by the Bankruptcy Court. "Any such contract not assumed within 60 days after qualification of the trustee, or within such further or reduced time as the Court may allow within such

60-day period, shall be deemed to be rejected." Bankruptcy Rule 607. "[R]ejection is to be inferred unless assumption is satisfactorily proved." *In re Luscombe Engineering Co.*, 268 F.2d 683, 687 (3d Cir. 1959).

■ In the case at bar, the trustee has done nothing to assume the contract, and indeed has expressed zealously his desire to disaffirm the January 25 agreement of sale. Accordingly, that contract is hereby deemed to be rejected.

■ The effect of the rejection of an executory contract by a trustee is that the estate of the bankrupt is no longer obligated to perform those parts of the contract which, at the time of the filing of the bankruptcy petition, are not yet performed. Thus, the trustee is not bound to complete rehabilitation of the two properties, or to sell them at the undervalued price established by defendant, or to sell only to buyers approved by defendant Authority.

Second, the trustee argues that these liens are not valid—that, for a lien to be valid in Pennsylvania, it must either secure the repayment of a debt or the performance of some other act: Since the lien in favor of the Redevelopment Authority is not based on any money advanced to the bankrupt by the defendant, and since any acts, the performance of which the mortgage was intended to secure, no longer need be performed, then the lien evidenced by the mortgage must be invalid.

In other words, the trustee takes the position that since his rejection of the executory contract eliminates the estate's duty to perform any further rehabilitation of the two properties, the mortgages purporting to secure that performance are no longer valid. The invalidity, contends the trustee, results from a failure of consideration which occurs because the bankrupt's underlying obligation to perform no longer exists. We conclude, for reasons given hereinafter, that the two $5,000 mortgages in favor of the

Authority are indeed valid and survive, as security, the trustee's rejection of the executory contract.

■ When the trustee rejects an executory contract, he does not thereby extinguish the estate's liability for its breach of contract. (See § 63c of the Bankruptcy Act.)[2] The trustee is instead being permitted by § 70b to alter the type of obligation for which the estate is liable. Therefore, it cannot be said that rejection of the instant agreement and its performance covenants deprives the Authority of its security in the two properties.

Third, a sale of § 70a property free and clear of encumbrances should increase the value of the estate over what it would otherwise be, but not at the expense of creditors whose claims are secured by the property which is sold.

Assuming, as we do, the power of a court in bankruptcy to order a sale clear of encumbrance, the law is that before such power is exercised, it must be shown, first, that such sale will benefit general creditors, and, secondly, that it will not injure existing liens.

*Monroe County Bank of East Stroudsburg, Pa. v. Dreher*, 88 F.2d 288, 288 (3d Cir. 1937). If the properties in the case at bar can be sold at a total price exceeding the amount of all claims secured in the properties, as well as the cost of additional rehabilitative work needed to ready the properties for sale, then we may conclude that both tests are satisfied.

The amount of total encumbrance on the two properties is $33,800 and consists of the $23,800 blanket mortgage in favor of the Commonwealth National Bank plus the two $5,000 mortgages in favor of defendant, Redevelopment Authority. Richard Middleton testified that to complete rehabilitation of the North Third Street property an expenditure of approximately $1,000–$1,500

---

**2.** "The effect of rejection, actual or constructive, is that such rejection constitutes a beach of contract giving the other party the right to claim damages." 4A *Collier on Bankruptcy* ¶ 70.43[9] at 537–538 (14th ed. 1978); *Accord*

*Seedman v. Friedman*, 132 F.2d 290, 298 (2d Cir. 1942); *In re New York Investors Mutual Group, Inc.*, 143 F.Supp. 51, 54–56 (S.D.N.Y. 1956).

would be required; and, to complete the Perry Street property would cost an additional $4,000–$5,000. (N.T. at 16–17.) Mr. Myers, for the Redevelopment Authority, had an opinion about the cost of additional repairs, but his information was based on a past report of another inspector. Because the bankrupt's inspection of the property was more recent and as he is in a better position to know, we find his estimates more reliable. We will assume the higher of the figures quoted by the bankrupt, yielding a total cost of additional rehabilitation of $6,500.

Thus, in order for the sale of these properties to benefit the estate, the proceeds must exceed the sum of $6,500 plus $33,800 or $40,300.

■ The only testimony as to the likely value of the two properties upon completion of the rehabilitation was offered by the bankrupt, Richard Middleton. (N.T. at 17–18.) The projected values for the North Third Street property and for the Perry Street property were $41,000 and $26,500, respectively. If the parcels were indeed sold for these amounts, the bankrupt's estate would gross $57,500. This sum is sufficient to pay all claims secured in the property and still increase the fund available for general creditors of the estate by a net amount of approximately $17,200.[3]

There thus appears to be sufficient equity in the two properties to warrant an order to sell them free and clear.

■ However, even when it appears that certain action by the trustee will benefit the bankruptcy estate, this Court may override decisions by the trustee and issue whatever orders appear to best serve the equities in the case. *In re Olin of N. Y., Inc.*, 3 BCD 405 (S.D.N.Y.1977). "There is an overriding consideration that equitable principles govern the exercise of Bankruptcy jurisdiction." *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966).

Defendant contends that to allow the trustee to disaffirm the bankrupt's obligation to sell the North Third Street and Perry Street properties at the prices and to the buyers designated by defendant will subvert a public policy which is superior to that of the bankruptcy laws. The Community Development program, pursuant to which defendant entered into the Agreement of Sale with the bankrupt, has, according to the testimony of Mr. Myers, a dual purpose: "to provide those persons who normally cannot afford to purchase a house with the opportunity to purchase one, as well as to improve the housing stock within certain communities within Lancaster County . . . ." (N.T. at 37.)

Redevelopment authorities in Pennsylvania are established pursuant to the Urban Redevelopment Law, codified at Pa.Stat. Ann. tit. 35, §§ 1701–1719.1 (Purdon 1979). Section 2 of the Act, entitled "Findings and Declarations of Policy," lists eight legislative findings before declaring the policy of the Act. Nowhere in any of the findings of fact, or in the statement of policy, is there any provision for housing for low or moderate-income persons. Rather, the language consistently focuses solely on the goal of urban redevelopment. The policy statement reads as follows:

Therefore, it is hereby declared to be the policy of the Commonwealth of Pennsylvania to promote the health, safety and welfare of the inhabitants thereof by the creation of bodies corporate and politic to be known as Redevelopment Authorities, which shall exist and operate for the public purposes of the elimination of blighted areas through economically and socially sound redevelopment of such areas, as provided by this act, in conformity with the comprehensive general plan of their respective municipalities for residential, recreational, commercial, industrial or other purposes, and otherwise encouraging the provision of healthful homes, a decent living environment and

---

**3.** Moreover, there was testimony to the effect that, even without completion of rehabilitation in these properties, they would bring enough at

sale to pay the lienholders and still have something left for the general creditors. N.T. at 18–20.

adequate places of employment of [sic] the people of this Commonwealth. Such purposes are hereby declared to be public uses for which public money may be spent and private property may be acquired by the exercise of the power of eminent domain.

Pa.Stat.Ann. tit. 35, § 1702 (Purdon Supp. 1979).

We find nothing inconsistent in permitting the trustee to sell these two properties at fair market value and the enunciated state policy. Nonetheless, even if this state policy were in fact inconsistent with the administration of the bankruptcy laws, the federal law would still prevail by virtue of the "Supremacy Clause." U.S.Const. art. I, § 8, cl. 4.

Defendant, in its brief, and for the first time, contends that the program which it sought to administer in contracting with the bankrupt is funded with federal dollars, pursuant to the Federal Housing and Community Act of 1977, and thus is an arm of a Congressional policy to provide housing for persons of low income. There is no support for this contention in the record, nor is defendant's argument developed to the extent that this Court could make a finding in its favor on the basis of that argument.

Moreover, defendant's policy argument appears especially superfluous in light of defendant's concession at the October 16, 1979 hearing, that the Redevelopment Authority would not object to a sale of the properties free and clear, as long as the Authority were able to recover on the two $5,000 mortgages. (N.T. at 42.) "[T]he object of the bankruptcy laws is the equitable distribution of the debtor's assets amongst his creditors . . . ." *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 451, 57 S.Ct. 298, 301, 81 L.Ed. 340 (1937). We conclude that the sale of these properties free and clear of liens and encumbrances will further that end.