**In re Glade S. BOOTH and Glade S. Booth dba G. S. Booth Enterprises, Debtor.**

**Bankruptcy No. 80–00292.**

United States Bankruptcy Court, D. Utah.

April 13, 1982.

William T. Thurman, McKay, Burton, Thurman & Condie, Salt Lake City, Utah, for debtor.

Kim R. Wilson, Snow, Christensen & Martineau, Salt Lake City, Utah, for Lewis and Edris Calvert.

Richard I. Aaron, Salt Lake City, Utah, for Noel deNevers.

4. The average of the comparable sales was approximately $80,000.

RALPH R. MABEY, Bankruptcy Judge.

## INTRODUCTION AND FACTUAL BACKGROUND

This case asks whether debtor, who is vendee under a contract for deed, has rights in an "executory contract" within the meaning of 11 U.S.C. Section 365.

Debtor is a debtor in possession under Chapter 11.[1] He is a broker and dealer in real property. His schedules show land worth $2,641,550, most of which has been bought or sold on contracts for deed.

Lewis and Edris Calvert (sellers) made a contract to sell land to debtor at a price of $97,200, with $1,100 down, and the balance payable over time with interest. Sellers must convey title when debtor completes performance. They may forfeit his interest if he defaults. Debtor has resold the property, again using a contract, to a third party, John Collett.

Sellers moved for an order, pursuant to Section 365(d)(2), directing debtor to assume or reject their contract. Debtor demurred, arguing that the contract is not executory and therefore Section 365 is inapplicable. After denying the motion orally on the record, the court files this explanatory memorandum.

## EXECUTORY CONTRACTS AND BANKRUPTCY POLICY

Sellers point to the definition of executory contract formulated by Professor Countryman: "a contract under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, "Executory Contracts in Bankruptcy: Part I," 57 Minn.L.Rev. 439, 460 (1973).[2] This definition embraces the contract for deed, they maintain, because both sides have unperformed obligations, viz. payment by debtor and delivery of title by sellers. Failure of either to complete performance would constitute a material breach excusing the performance of the other.[3]

1. He therefore has the powers of a trustee, 11 U.S.C. Section 1107(a), and may assume or reject executory contracts under Section 365(a). "Debtor" is used as a synonym for "trustee."

2. The Countryman definition is mentioned in the legislative history. The Commission Report quotes Countryman, Report of the Commission on the Bankruptcy Laws of the United States, H.Doc.No.93–137, Part II, at 198–199 (1973), while the House and Senate Reports contain an abridgement of his test, H.R.Rep.No. 95- 595, 95th Cong., 1st Sess. 347 (1977) and Sen.Rep.No.95–989, 95th Cong., 2d Sess. 58 (1978), U.S.Code Cong. & Admin.News, p. 5787.

3. Most, if not all, authorities have assumed, often without analysis, and at least where debtor is vendor, that contracts for deed are executory contracts. See, e.g., 2 Collier on Bankruptcy ¶ 365.03 at 365–18 (15th ed. 1980); id ¶ 365.10 at 365–46; 4A Collier on Bankruptcy ¶ 70.43 at 522 n. 16 (14th ed. 1978); Nambar, Contracts in Bankruptcy 141–152 (1977); Osborne, Nelson and Whitman, Real Estate Finance Law 102–104 (3d ed. 1979); Countryman, supra at 467–473; Fogel, "Executory Contracts and Unexpired Leases in the Bankruptcy Code," 64 Minn.L.Rev. 341, 385–387 (1980); Gottesman, "The Onus of Executory Contracts in Bankruptcy: Focus on Vendors and Lessors," Prac.Law (April, 1958); Krasnowiecki, "The Impact of the New Bankruptcy Reform Act on Real Estate Development and Financing," 53 Am.Bank.L.J. 363 (1979); Lacey, "Land Sale Contracts in Bankruptcy," 21 U.C.L.A.L.Rev. 477 (1973); Lynn, "Bankruptcy and the Land Sales Contract: The Rights of the Vendee Vis-a-Vis The Vendor's Bankruptcy Trustee," 5 Tex.Tech.L.Rev. 677 (1974); Rickles, "Claims Arising From Breach of Executory Contracts (Sections 70B and 63A(9))," 26 J.Nat. Assoc.Refs.Bank. 21 (1952); Shanker, "The Treatment of Executory Contracts and Leases in Bankruptcy Chapter X and XI Proceedings," Prac.Law. (April, 1972); Silverstein, "Rejection of Executory Contracts in Bankruptcy and Reorganization," 31 U.Chi.L.Rev. 467, 478–479 (1964); Note, "Bankruptcy and the Land Sale Contract," 23 Case Wes.Res.L.Rev. 393 (1972); Note, "Recent Decisions," 43 Va.L.Rev. 253 (1957); Note, "Effect of Bankruptcy on Contracts for the Purchase or Sale of Realty," 6 Tex.L.Rev. 358 (1928); Gulf Petroleum, S. A. v. Collazo, 316 F.2d 257 (1st Cir. 1963); Matter of Philadelphia Penn Worsted Company, 278 F.2d 661 (3d Cir. 1960); Matter of New York Investors Mutual Group, 143 F.Supp. 51 (S.D.N.Y. 1956); In re Swindle, 188 F.Supp. 601 (D.Or. 1960); In re Charles Nelson Co., 27 F.Supp. 673 (N.D.Cal.1939); In re Middleton, 3 B.R. 610 (Bkrtcy.E.D.Pa., 1980); In re Mercury Home Development Co., 4 B.C.D. 837 (N.D.Cal.1978);

Countryman propounded a definition of executory contract which was "functional," that is, "defined in the light of the purpose for which the trustee is given the option to assume or reject. Similar to his general power to abandon or accept other property, this is an option to be exercised when it will benefit the estate." Countryman, *supra* at 450. From this premise, he framed his test of performance due on both sides. If the creditor has performed, rejection would be meaningless, since "the estate has whatever benefit it can obtain .... and ... rejection would neither add to nor detract from the creditor's claim or the estate's liability." *Id.* at 451. Assumption likewise would be meaningless, and further, would transform the obligation of debtor into a cost of administration, "a prerogative which the Bankruptcy Act has never been supposed to have vested in either the trustee or the court." *Id.* at 452. If the debtor has performed, assumption adds nothing to his right to performance. Rejection, on the other hand, would not constitute a breach. In short, the Countryman test is an index to when assumption or rejection of a contract will "benefit the estate" and therefore of when a contract is executory.

Section 365, however, reflects a number of policies, including not only benefit to the estate but also protection of creditors. The Countryman test may often define the benefit to the estate, but does it always? And does it speak to the protection of creditors? *See* Julis, "Classifying Rights and Interests Under the Bankruptcy Code," 55 Am.Bank. L.J. 223 (1981). These questions underlie the refusal of the Commission to define executory contract, Report of the Commission on the Bankruptcy Laws of the United States, H.Doc.No.93–137, Part I, at 199 (1973) ("any succinct statutory language risks an unintended omission or inclusion"), especially in relation to the contract for deed.

Sections 365(i) and 365(j), for example, give special treatment to nondebtor vendees of land sale contracts. They were passed in response to the plight of nondebtor vendees under former law. In *In re New York Investors Mutual Group*, 143 F.Supp. 51 (S.D.N.Y.1956), the debtor had contracted to sell land to a buyer for $105,000. There was a down payment of $15,000 with the balance due at closing in 18 months. Prior to closing, debtor was adjudicated bankrupt. The trustee sought and the referee ordered rejection of the contract with buyer. This order was affirmed on appeal. The court ruled that the interest of buyer was subject to rejection by the trustee and that the remedy of buyer "is a claim for damages for breach of the agreement." *Id.* at 54. Thus buyer, who under state law may have owned the land, was relegated to the status of an unsecured creditor.[4] *New York Investors* was followed. *E.g., Gulf Petroleum, S. A. v. Collazo*, 316 F.2d 257 (1st Cir. 1963); *Matter of Philadelphia Penn Worsted Company*, 278 F.2d 661 (3d Cir. 1960). But there was uneasiness over its result, and some courts moved to soften its impact. *E.g., In re Mercury Homes Devel-*

*In re Cleve*, 3 B.C.D. 1217 (S.D.Cal.1977); *In re Williams*, 1 B.C.D. 171 (W.D.Okl.1974). *Cf. In the Matter of Gulfco Investment Corporation*, 520 F.2d 741 (10th Cir. 1975); *In the Matters of American National Trust, et al.*, 426 F.2d 1059 (7th Cir. 1970); *Nostromo, Inc. v. Fahrenkrog*, 388 F.2d 82 (8th Cir. 1968); *National Bank of Kentucky v. Louisville Trust Co.*, 67 F.2d 97 (6th Cir. 1933); *Clark v. Snelling*, 205 F. 240 (1st Cir. 1913); *In re Robertson*, 41 F.Supp. 665 (W.D.Ark.1941); *In the Matter of Investors Development Company*, 6 B.C.D. 1415, 7 B.R. 772, (Bkrtcy.D.N.J.1980).

4. The down payment in *New York Investors* was secured with a lien on the property. The lien had been recorded and was not avoidable by the trustee. Countryman, however, notes that, "[u]nless he is well counseled and protected by draftsmanship in advance," the buyer "may...be left with only a provable general claim for damages." Countryman, *supra* at 471. What is more, where the debtor is vendor, he is also debtor in possession, armed with the strong-arm powers of a trustee. Absent special protection, even when recorded, and where possession is not equivalent to recording, the interest of a buyer might be avoided. *See, e.g., id.* at 471; Nelson and Whitman, "The Installment Land Contract—A National Viewpoint," 1977 B.Y.U.L.Rev. 541, 567 & n. 87; *In re Sayre Village Manor*, 120 F.Supp. 215 (D.N.J.1954). *Cf. In re Summit Land Co.*, 13 B.R. 310, 318–319 n. 14 (Bkrtcy.D.Utah 1981).

*opment Co.*, 4 B.C.D. 837 (N.D.Cal.1978) (trustee may reject contract but cannot deprive vendee of interest in land).

Meanwhile, reformers sought change. The Commission spearheaded this movement and Sections 365(i) and 365(j) evolved from its report, *see* Report of the Commission on the Bankruptcy Laws of the United States, *supra* at Sections 4–602(d) and 4–602(f)(1), which in turn, was derived from a working paper, *see id.* at Part I, at 199 n. 114, at 206 n. 160, Part II, at 158 n. 17, at 172–173 n. 21, later published as Lacy, "Land Sale Contracts in Bankruptcy," 21 U.C.L.A.L.Rev. 477 (1973).

The method for apportioning the benefits and burdens of insolvency, Lacy wrote, cannot be found through "definitions of 'executory' . . . . Instead, the search should be for a policy which defines those interests of present or potential value which may properly be taken from others for the benefit of the bankrupt or his estate." *Id.* at 482. Nondebtor vendees deserve special treatment, not because their contract is executory in the sense that performance remains due on both sides, but because "the purchaser in this kind of contract is likely to be the buyer of a home or farm or small business who has adjusted to a new location. Very often, especially in the case of a residential buyer, he will be poor. Certainly, modern American bankruptcy policy places as high a value on relieving the poor from the consequences of their own and others' improvidence as in doing perfect justice between creditors." *Id.* at 484.

He criticized the assumption that "the purchaser whose contract is rejected after he has paid a part of the price will have only an unsecured claim" but that "he may get the land if he has paid the entire price on the ground that the contract is no longer 'executory.' . . . . The suggested distinc-

tion between paid-in-part and paid-in-full seems utterly capricious. Instead, one should not speculate about the meaning of 'executory' but rather should consider what ought to be thrown into the pot for general creditors and when it is fair to recognize special claims to certain assets." Lacy, *supra* at 487.[5]

Others echoed Lacy. One, emphasizing the "economic consequences" of rejection, argued that the nondebtor vendee should not be "used as a resource by the trustee to increase the bankrupt's estate and the cost of the bankruptcy [should] be completely borne by commercial creditors. This would increase the creditors' incentive to deal only with sound vendors and would entirely remove this 'policing' function from the vendees, who occupy the poorest position to exercise such control. Moreover, the commercial creditors are capable of distributing the risks of a vendor's bankruptcy, but the vendees are not. The creditors can simply pass on the increased costs of vendor bankruptcy by raising the cost of credit. Most likely, the vendees would ultimately pay for most of this increase in the cost of credit. But they would be paying as a group, and therefore the risks of bankruptcy would be distributed evenly and rationally—rather than falling completely on a small and arbitrary group of vendees." Note, "Bankruptcy and the Land Sale Contract," 23 Case Wes.Res.L.Rev. 393, 410–411 (1972).

Thus, Sections 365(i) and 365(j), far from representing the Countryman test, are a tonic for the consequence of its application. This suggests that, in the final analysis, executory contracts are measured not by a mutuality of commitments but by the nature of the parties and the goals of reorganization. A debtor as vendee is free from the constraints of Section 365, and is thereby afforded flexibility in proposing a plan, but meanwhile must provide, upon request,

---

5. Similarly, he argued that the vendee not in possession is entitled to at least a lien for the amount paid on the interest of the bankrupt vendor: "There is no question that the purchaser enjoys such a lien in nonbankruptcy situations where the contract aborts without fault on his part. The lien is not an incident of the contract but is a judicial creation called for by the equities of the situation. The purchaser has made payments on the reasonable assumption that he was the equitable owner of the land and not in reliance on the vendor's general credit. This noncontractual nature of the lien permits an argument that it is not subject to the trustee's rejection power." Lacy, *supra* at 485.

adequate protection to vendors. A debtor as vendor may use Section 365 as a springboard to rehabilitation but not at the expense of vendees. *Cf. In re Summit Land Co.*, 13 B.R. 310 (Bkrtcy.D.Utah 1980). Thus, it is the consequences of applying Section 365 to a party, especially in terms of benefit to the estate and the protection of creditors, not the form of contract between vendor and vendee, which controls. This conclusion is supported by many statutory provisions and much judicial gloss.[6]

**6.** There are many examples of the use of "policy," rather than a rule like the Countryman test, in determining what is an "executory contract" within the scope of Section 365 under the Code and Section 70(b) under the Act.

Although "the unexpired lease is the archetype of the rejectable contract," Silverstein, "Rejection of Executory Contracts in Bankruptcy and Reorganization," 31 U.Chi.L.Rev. 467, 479 (1964), its treatment has varied depending upon the policies at stake. *In re Freeman*, 49 F.Supp. 163 (S.D.Ga.1943), permitted rejection of a lease, notwithstanding language in Section 70(b) which forbade deprivation of a lessee's estate, because this result furthered rehabilitation under Chapter XII. Collier criticizes the decision because the court "overlooked the fact that the lessee had a vested estate that is distinct from the executory covenant contained in the lease. In a case concerning a lease of personal property there is no 'estate' and the lessee's interest may be terminated by rejection of the lease. In the case of a lease of real property, the desire to effect a feasible plan of reorganization could not override the vested rights of lessees who were not mere creditors of the debtor." 2 Collier on Bankruptcy ¶ 365.-09 at 365–45—365–46 (15th ed. 1980). Put more directly, "[i]n some situations...it is socially desirable that the lessee have a high degree of assurance that his possession will not be interrupted by lessor bankruptcy. The lessee with a large investment in equipment, inventory and good will, for instance, has a legitimate claim to greater protection than the ordinary unsecured creditor." Silverstein, *supra* at 484. *See also* Creedon and Zinman, "Landlord's Bankruptcy: *Laissez Les Lesees*," 26 Bus.Law. 1391, 1402 (1971).

Under the Code, and Section 365, the exceptions virtually swallow the Countryman rule. Personal service contracts, whether or not performance is due on both sides, are nonassumable under Section 365(c)(1). This "carries out a policy, implemented judicially....against the use of legal compulsion...to force a nondebtor party either to accept the personal services of or to perform personal services for the debtor or the trustee succeeding him." Report of the Commission on the Bankruptcy Laws of the United States, *supra* Part II, at 158. *See also* Countryman, "Executory Contracts in Bankruptcy: Part II," 58 Minn.L.Rev. 479, 482–484 (1974). Contracts for the extension of credit or other "financial accommodations," or to issue securities of the debtor, whether or not performance is due on both sides, are nonassumable under Section 365(c)(2). Shopping center leases, Section 365(b)(3), aircraft equipment and ocean vessels, 11 U.S.C. Section 1110, and rolling stock, 11 U.S.C. Section 1168, are given special dispensations.

Under the Act, and Section 70(b), a security agreement, even though performance remained due on both sides, was not an executory contract. This "shielding" of secured creditors was "justified because unsecured creditors have notice of the lien through recordation or filing." Silverstein, *supra* at 478. Similarly, "[t]he bankrupt licensee of a patent, copyright or trademark usually has an executory duty to pay royalties and the licensor has an executory duty not to license other persons. Although one might suppose that a trustee in bankruptcy can reject such a contract since it is executory on both sides, the American cases most nearly in point have implied that it is not rejectable," probably because of a "judicially created policy of protection and encouragement of creative genius." *Id.* at 480 and 482. Public utilities are another special case due to "countervailing public policy." *Id.* at 482. And so are collective bargaining compacts. *See, e.g.,* Hughes, "'Wavering Between the Profit and the Loss': Operating a Business During Reorganization Under Chapter 11 of the New Bankruptcy Code," 54 Am.Bank.L.J. 45, 84–86 (1980); Levy and Blum, "Limitations on Rejection of Union Contracts Under the Bankruptcy Act," 83 Comm.L.J. 259 (1978); Note, "The Bankruptcy Law's Effect on Collective Bargaining Agreements," 81 Colum.L.Rev. 391 (1981); Note, "The Labor-Bankruptcy Conflict: Rejection of a Debtor's Collective Bargaining Agreement," 80 Mich.L.Rev. 134 (1981); Comment, "Bankruptcy and the Rejection of Collective Bargaining Agreements," 51 Notre Dame L.Rev. 819 (1976); Comment, "Collective Bargaining Agreements and Bankruptcy," 42 So.Cal.L.Rev. 477 (1969); *In re Unishops, Inc.*, 543 F.2d 1017 (2d Cir. 1976); *Truck Drivers Local Union No. 807 v. Bohack Corp.*, 541 F.2d 312 (2d Cir. 1976); *Brotherhood of Railway, Airline & Steamship Clerks v. REA Express, Inc.*, 523 F.2d 164 (2d Cir. 1975); *Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.*, 519 F.2d 698 (2d Cir. 1975); *Local Joint Executive Bd. v. Hotel Circle, Inc.*, 613 F.2d 210 (9th Cir. 1980); *Matter of Alan Wood Steel Co.*, 449 F.Supp. 165 (D.Pa.1978); *In re Overseas Nat'l Airways, Inc.*, 238 F.Supp. 359 (E.D.N.Y.1965).

This approach may be criticized for being result oriented. Result-orientation, however, is endemic to the policymaking which has deter-

## EXECUTORY CONTRACTS AND THE POLICIES OF BENEFIT TO THE ESTATE AND THE PROTECTION OF CREDITORS

█ The contract for deed, where debtor is vendee, benefits the estate more when viewed as a lien[7] than as an executory contract. This is because treatment of the contract for deed as a lien enlarges the value of the estate and furthers the rehabilitation of the debtor. This treatment likewise makes adequate protection available to creditors.

█ 1. *Enlarging The Value of The Estate.* The assumption or rejection of executory contracts, like the strong-arm and other avoiding powers, "is a valuable weapon . . . in the armory of the trustee," meant to free "his estate to pay a larger dividend to general creditors." Silverstein, "Rejection of Executory Contracts In Bankruptcy and

Reorganization," 31 U.Chi.L.Rev. 467, 468 (1964). If the contract for deed is viewed as an executory contract, it may be assumed or rejected, but if assumed, it must be taken *cum onere*, that is, debtor must take the contract as written, with its benefits and burdens.

In practical terms this means that, absent assumption of the contract, vendor may enforce his remedy of forfeiture. Vendor, although in substance a mortgagee,[8] may receive an advantage over other lienors, and the estate may be deprived of whatever equity exists in the property. The bankruptcy court, as a court of equity, regards substance over form, demands equality of treatment among creditors, and loathes a forfeiture. The contract should be treated as a lien; the vendor is thereby placed on a par with other lienors; forfeiture and the loss of equity are prevented.[9]

mined what is an executory contract and when it is rejectable within the scope of Sections 365 and 70(b). Indeed, the Countryman test, which is predicated on the policy of benefit to the estate, is result oriented. Some commentators and courts have frankly admitted as much. *See, e.g.,* Julis, *supra* at 246 and 249 ("the framework calls for the systematic identification of the consequences to the estate, the debtor, and to the nondebtor party to the contract in question, that arise from applying Section 365 to the contract"); *In re Jolly,* 574 F.2d 349, 351 (6th Cir. 1978) ("such definitions [as the Countryman test] are helpful, but do not resolve this problem. The key, it seems, to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act").

7. "Lien" is shorthand for "allowed secured claim" under 11 U.S.C. Section 506(a). *See In re Alyucan Interstate Corp.,* 12 B.R. 803, 4 C.B.C.2d 1066, 1070 n. 10 (Bkrtcy.D.Utah 1981). It is assumed that vendors have a "claim" within the meaning of 11 U.S.C. Section 101(4). *See generally,* Julis, *supra.*

8. *Compare, e.g.,* Osborne, Nelson and Whitman, Real Estate Finance Law 79 (1979) (contract for deed and purchase money mortgage fulfill same "economic function") *with* Cunningham & Tischler, "Disguised Real Estate Security Transactions As Mortgages in Sub-

stance," 26 Rutgers L.Rev. 1, 7–8 & ns. 22–23 (1972), (distinguishing purchase money mortgages and disguised mortgages from contracts for deed). Several commentators have bemoaned the fact that the "functional equivalence" of contracts for deed and purchase money mortgages "is not reflected in their legal position in bankruptcy." *E.g.,* Nambar, Contracts in Bankruptcy 141 and 146 (1977).

9. Many states, by legislative act or judicial decision, have "ameliorated the harsh impact of automatic forfeiture" and assimilated the contract for deed into the law of mortgages. Osborne, Nelson and Whitman, Real Estate Finance Law 81 (1979). This has been accomplished, for example, by broadly construing waivers of default, creating an equity of redemption, ordering foreclosure as a mortgage, or permitting restitution of payments. *See generally, id.* at 79–110; Nelson and Whitman, "The Installment Land Contract—A National Viewpoint," 1977 B.Y.U.L.Rev. 541. Nevertheless, if forfeiture is invoked prepetition, and if no further act is necessary to terminate the contract, the interest of the vendee may expire before a petition can be filed. Even if a petition is filed, after invocation but before the grace period runs, some authorities suggest that 11 U.S.C. Section 108(b) extends the grace period, but once past, the interest of vendee is no longer property of the estate, and vendor may repossess without obtaining relief from the stay. *See, e.g.,* 2 Collier on Bankruptcy ¶ 365.04 at 365–29 (15th ed. 1980); Miller and Cook, A Practical Guide to the Bankruptcy Reform Act 159 (1979). *Cf.* Countryman, "Ex-

This result is analogous to the treatment of security interests disguised as leases. The lessor is entitled to assumption and performance of the lease or rejection and return of the property, with any equity lost to the estate. The security interest disguised as a lease, however, is treated as a lien, with any equity available to the estate. *Cf.* Countryman, *supra* at 484–491; *In re Scrap Disposal, Inc.*, 15 B.R. 296, 8 B.C.D. 504, 506 (Bkrtcy.App.Pan., 9th Cir., 1981); *In re Rojas*, 10 B.R. 353 (Bkrtcy.App. Panel, 9th Cir., 1981).[10]

ecutory Contracts in Bankruptcy: Part II," 58 Minn.L.Rev. 479, 505–509 (1974); *In the Matter. of Schokbeton Industries, Inc.*, 466 F.2d 171 (5th Cir. 1972); *In re Santa Fe Development and Mortgage Corp.*, 16 B.R. 165, 8 B.C.D. 704 (Bkrtcy.Bank.App.Pan., 9th Cir., 1981); *In re 312 Bethel Corp.*, 1 B.C.D. 467 (E.D.Pa.1975). These authorities do not discuss the possibility that the provisions for cure in Sections 365(b), 365(d)(2), and 11 U.S,C. Sections 1123(a)(5)(G) and 1123(b)(2) may override Section 108(a). *See* Julis, *supra* at 247. If so, this may argue for treatment of the contract for deed as an executory contract. Refuge from the perils of Section 108(b) could be found in Sections 365(b), 365(d)(2), 1123(a)(5)(G) and 1123(b)(2). This argument acquires force from rulings that this refuge may not be available to mortgagors. *See, e.g., In re Jenkins*, 4 C.B.C.2d 1425 (D.Colo.1981). In other words, contracts for deed may have an opportunity to cure under the auspices of Sections 365(b), 365(d)(2), 1123(a)(5)(G) and 1123(b)(2), but liens may be confined to the short leash of Section 108(b). On the other hand, do the provisions for cure made available to liens in 11 U.S.C. Section 1124(2) supersede Section 108(b), and if so, does this restore contracts for deed and liens to equal *footing? But cf. In re Saint Peter's School*, 16 B.R. 404 (Bkrtcy.S.D.N.Y.1982) (Section 1124(2) not available to "cure" judgment of foreclosure). Moreover, if the contract for deed is an executory contract, once assumed, is the remedy of forfeiture revived and does a subsequent default mean loss to the debtor? *See, e.g.,* Countryman, "Executory Contracts in Bankruptcy: Part II," 58 Minn.L. Rev. 479, 518 (1974).

**10.** The legislative history may support this conclusion. Section 365(g) provides that rejection of an unexpired lease, not previously assumed in a case, constitutes a breach of such lease as of the date of the petition, giving the lessor an unsecured claim for damages. Damages are measured, in part, under 11 U.S.C. Section 502(b)(7), which places a ceiling on the landlord's allowable claim. House and Senate sponsors of the bill commented, however, that "[a]s used in Section 502(b)(7), the phrase 'lease of real property' applies only to a 'true' or 'bona fide' lease and does not apply to financing leases of real property or interests therein, or to leases of such property which are intended as security.

Historically, the limitation on allowable claims of lessors of real property was based on two considerations. First, the amount of the lessor's damages on breach of a real estate lease was considered contingent and difficult to prove. Partly for this reason, claims of a lessor of real estate were not provable prior to the 1934 amendments to the Bankruptcy Act. Second, in a true lease of real property, the lessor retains all risks and benefits as to the value of the real estate at the termination of the lease. Historically, it was, therefore, considered equitable to limit the claims of real estate lessors.

However, these considerations are not present in 'lease financing' transactions where, in substance, the 'lease' involves a sale of the real estate and the rental payments are in substance the payment of principal and interest on a secured loan or sale. In a financing lease the lessor is essentially a secured or unsecured creditor (depending upon whether his interest is perfected or not) of the debtor, and the lessor's claim should not be subject to the 502(b)(7) limitation. Financing 'leases' are in substance installment sales or loans. The 'lessors' are essentially sellers or lenders and should be treated as such for purposes of the bankruptcy law.

Whether a 'lease' is a true or bona fide lease or, in the alternative, a financing 'lease' or a lease intended as security depends upon the circumstances of each case. The distinction between a true lease and a financing transaction is based upon the economic substance of the transaction and not, for example, upon the locus of title, the form of the transaction or the fact that the transaction is denominated as a 'lease.' The fact that the lessee, upon compliance with the terms of the lease, becomes or has the option to become the owner of the leased property for no additional consideration or for nominal consideration indicates that the transaction is a financing lease or lease intended as security. In such cases, the lessor has no substantial interest in the leased property at the expiration of the lease term. In addition, the fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property." 124 Cong.Rec. H11,093–11,094 (daily ed., September 28, 1978); 124 Cong.Rec. S17,410 (daily ed., October 6, 1978). *See generally* Albenda and

■ 2. *Furthering the Rehabilitation of the Debtor.* Executory contracts should be handled to "assist in the debtor's rehabilitation." H.R.Rep.No.95–595, 95th Cong., 1st Sess. 348 (1977), U.S.Code Cong. & Admin. News, p. 6304. If the contract is executory, and if it is assumed during the interim between petition and plan, defaults must be cured, damages must be paid, and adequate assurance of performance must be given, all as costs of administration. If the contract is assumed in a plan, the same conditions must be satisfied with the accumulated costs of administration payable on the effective date of the plan.[11] The same burdens are imposed if the contract is assigned, in or without a plan.[12] Indeed, one court has held that the stay does not prevent suits for payments which accrue postpetition as administrative claims. *See In re Kors, Inc.,* 13 B.R. 683 (Bkrtcy.D.Vt.1981).[13]

If the contract is a lien, assumption is irrelevant, and no administrative costs are incurred.[14] Instead of taking the contract *cum onere,* the lien may be "dealt with" in a plan, *viz.,* by scaling down the debt, reducing the interest rate, and extending ma-

Lief, "Net Lease Financing Transactions Under the Proposed Bankruptcy Act of 1973," 30 Bus. Law. 713 (1975).

11. The interface of Section 365(b) and 11 U.S.C. Sections 1123(b)(2) and 1129(a)(9)(A) may complicate confirmation of a plan. Section 1123(b)(2) permits assumption or rejection of an executory contract in a plan. This is not, however, "blanket authority" to accept or reject an executory contract. It must be done "subject to Section 365." 5 Collier on Bankruptcy ¶ 1123.02[b] at 1123–17—1123–18 (15th ed. 1980). This means, where there has been a default, that among other things required by Section 365(b), debtor must cure or provide "adequate assurance" that he will "promptly cure" the default, and compensate or provide "adequate assurance" that he will "promptly compensate" for damages caused by the default, and provide "adequate assurance" of "future performance." All of these payments, including the prepetition arrearage, may be costs of administration, Miller and Cook, A Practical Guide to the Bankruptcy Reform Act 144 (1979), which under Section 1129(a)(9)(A) are payable on the effective date of the plan. Whether and to what extent Section 365(b), made applicable to plans under Section 1123(b)(2), may soften the rigors of Section 1129(a)(9)(A) is unknown. *Cf. In re Barrington Oaks General Partnership,* 15 B.R. 952, 8 B.C.D. 569, 571 n. 6 (Bkrtcy.D.Utah 1981) (for discussion of the term "effective date of a plan").

12. Treatment of a contract for deed as an executory contract may pose other obstacles to reorganization. Sections 365(c)(1)(A) and 365(c)(1)(B) forbid assumption or assignment of an executory contract without consent of the nondebtor and where "applicable law" excuses the nondebtor "from accepting performance from or rendering performance to the trustee or an assignee." Even if a vendee's interest is assignable in Utah, "[w]e may well see intensive lobbying efforts by real estate and other interests to induce state legislatures to adopt statutes which will effectively preclude trustees and debtors in possession from assuming or assigning leases, licenses or other critical types of executory agreements." Levit, "Use and Disposition of Property Under Chapter 11 of the Bankruptcy Code: Some Practical Concerns," 53 Am.Bank.L.J. 275, 278 n. 7 (1979).

Moreover, the Countryman test may imply that if the debtor commits a pre, or post-petition material breach, then the obligation of the creditor is discharged, leaving the contract non-executory. And indeed, Countryman suggests that this is an open question. *See* Countryman, "Executory Contracts in Bankruptcy: Part II," 58 Minn.L.Rev. 479, 516–517 (1974). Fogel, however, disagrees, arguing that this "applies the definition of executory contracts out of context" and that in this case "a simple definition of executory contract is not relevant." Fogel, "Executory Contracts and Unexpired Leases in the Bankruptcy Code," 64 Minn.L.Rev. 341, 355–356 (1980).

13. Assumption of a contract creates a postpetition obligation which is not subject to discharge. 1 Norton Bankruptcy Law and Practice ¶ 623.05 at Part 23-Page 3 (1981). If the contract is neither assumed nor rejected, it "rides through" the case and remains enforceable after the discharge. 5 Collier on Bankruptcy ¶ 1123.02[6] at 1123–17—1123–18 (15th ed. 1980); Countryman, "Executory Contracts in Bankruptcy: Part II," 58 Minn.L.Rev. 479, 561–562 (1974); Julis, *supra* at 226. *But see* Julis, *supra* at 250 n. 60 (contract will not "ride through" if breach of debtor is default and default creates "claim" within meaning of 11 U.S.C. Section 101(4)).

14. The exception to this rule would be any payments required adequately to protect lienors. This is improbable, however, where the collateral is land. *Cf. In re Alyucan Interstate Corp.,* 12 B.R. 803, 4 C.B.C.2d 1066 (Bkrtcy.D. Utah 1981).

turities.[15] With or without a plan, the property may be sold free of the lien.[16]

Debtor, like most dealers in the contract for deed, uses that instrument because other financing is unavailable. He can afford little down, and hopes to subdivide and resell in order to meet payments. Chapter 11 has not improved his cash flow. *Cf.* Countryman, *supra* at 484–491; *In re Yale Express System, Inc.,* 384 F.2d 990, 992 (2d Cir. 1967). Treating the contract as a lien thus allows more latitude in proposing a plan and thereby furthers the rehabilitation of the debtor.[17]

■ 3. *Adequate Protection of Creditors.* Vendors have two rights under a contract for deed: the right to payment, which is not adequately protected,[18] and the right to hold title as security, which is adequately protected. While the right to pay-

ment is suspended, the interest in property is adequately protected. This strikes a balance between vendors, other creditors, and the estate. Vendors are not preferred, for example, in terms of administrative claims, but are treated on a par with other mortgagees, *cf.* Silverstein, *supra* at 494–496, who are protected against any decrease in the value of their liens. *Cf. In re Alyucan Interstate Corp.,* 12 B.R. 803, 4 C.B.C.2d 1066 (Bkrtcy.D.Utah 1981).

## THE BASIS FOR DISTINGUISHING BETWEEN DEBTORS AS VENDORS AND AS VENDEES

■ Sellers contend that Sections 365(i) and 365(j) mean that contracts for deed are executory contracts. They argue that because Sections 365(i) and 365(j) treat some contracts for deed as executory contracts,[19]

**15.** If the contract is treated as an executory contract, it may not be exchanged for securities under a plan. The United States Securities and Exchange Commission has intervened in *Omega Financial Investment Corporation,* No. SA 80-00933–AP (C.D.Cal.) where debtor, a tax shelter investment business, owns "contractual commitments" from persons to invest in tax shelters. The plan proposed to exchange stock and either equipment or limited partnership interests for these commitments plus cash. The Commission objected on the ground that the commitments were not claims under 11 U.S.C. Section 101(4). At best, they were executory contracts, and hence, could not be exchanged for securities under 11 U.S.C. Sections 1123(a)(5)(J) and 1145(a). The debtor withdrew its plan. Sec, Annual Report of Corporate Reorganizations Under the Bankruptcy Laws 20–22 (1980). If the contract is treated as a lien, and if this means that it is a claim under Section 101(4), *see supra* note 8, at 58, it may be exchanged for securities under a plan. But if this means that it is an interest in property, it is uncertain whether it may be exchanged for securities under a plan. *See* Julis, *supra* at 230.

**16.** Some cases, however, notwithstanding treatment of the contract for deed as an executory contract, have permitted the vendee to sell the land free of the interest of the vendor. *See, e.g., Nostromo, Inc. v. Fahrenkrog,* 388 F.2d 82 (8th Cir. 1968); *In re Middleton,* 3 B.R. 610 (Bkrtcy.E.D.Pa., 1980); *In re Vertich,* 5 B.R. 684, 6 B.C.D. 846 (Bkrtcy.D.S.D.1980).

**17.** The debtor may still "reject" the contract, if it is "burdensome." Instead of relying upon Section 365, however, he may use the proce-

dure for abandonment in 11 U.S.C. Section 554. Abandonment may save administrative expense since, unlike Section 365(a), it may not require court approval. *But see In re Summit Land Co., supra,* 13 B.R. at 314–316.

**18.** The right to payment may not be an "interest in property" for purposes of obtaining adequate protection. 11 U.S.C. Section 361 protects against any decrease in value of the lien, it does not guarantee performance of the contract. If Section 361 guaranteed the benefit of the bargain as distinct from the bargain in value, it would be duplicative of Section 365. There would be no breathing spell for debtor to elect whether to assume or reject a contract. This election, in effect, would be made for him by Section 361. Moreover, upon assumption of a contract, "adequate assurance" of performance, unlike adequate protection, may be accomplished by promising an administrative priority. *Compare* H.R.Rep.No.95–595, 95th Cong., 1st Sess. 350 (1977) and *In re Keydata Corporation,* 12 B.R. 156, 7 B.C.D. 1122, 1123 (Bkrtcy.App.Pan., 1st Cir., 1981) (dictum) *with* 11 U.S.C. Section 361(3). *Cf.* Fogel, "Executory Contracts and Unexpired Leases in the Bankruptcy Code," 64 Minn.L.Rev. 341, 372–376 (1980).

**19.** Not every contract to sell realty is executory, even under Sections 365(i) and 365(j). These provisions treat "an executory contract of the debtor for the sale of real property," language which begs the question in this case. *Cf. In re Nite Lite Inns,* 13 B.R. 900, 7 B.C.D. 1388 (Bkrtcy.S.D.Cal.1981) (sale-leaseback transaction is disguised loan arrangement and

all contracts for deed must be executory contracts. Put differently, it would be anomalous if contracts where the debtor *sells* realty are executory but contracts where the debtor *buys* realty are not. This would result in the contract between debtor and Collett being executory and the contract between debtor and sellers being non-executory although both are identical in form. Consistency in the treatment of contracts for deed, whether debtor is vendor or vendee, is necessary for a sensible construction of the Code.

Seller's argument founders, however, on at least two shoals. First, treatment of the contract for deed as an executory contract, where debtor is vendee, ignores the reasons for enacting Sections 365(i) and 365(j). They were passed to give nondebtor vendees the protection of mortgagors. Viewing the contract for deed as a lien, where debtor is vendee, therefore is consistent with the spirit of these provisions. Second, consistency in terminology, that is treating contracts for deed as executory contracts under Section 365 in every instance, favors nondebtor vendees over debtor vendees and debtor vendors over debtor vendees in bankruptcy. Particularized treatment of the contract for deed is necessary to avoid these consequences.

*First.* Sections 365(i) and 365(j), as discussed above, were enacted to prevent harm which had occurred under prior law to non-debtor vendees. They accomplish this purpose, where the vendee is in possession, by allowing him to stay, continue payments, and receive title. In short, he is treated as a mortgagor, an analogy frequently drawn by proponents of Sections 365(i) and 365(j). *See, e.g.*, Nambar, Contracts in Bankruptcy 152 (1977); Lacy, *supra* at 480 and 485; Note, *supra* at 397 and 410.

Countryman notes that mortgages are not executory contracts and "where the vendor of land is himself the purchase money mortgagee, including those cases where applicable nonbankruptcy law will treat the land sale contract as a mortgage, the situation seems no different." Countryman, *supra* at 472. Then what of a debtor as vendor in California where contracts for deed are deemed mortgages? Under the Countryman test this would not be an executory contract. But this interpretation would deprive homeowners of the protection of Section 365(i). We afford them protection either by sacrificing the symmetry of sellers' argument or by recognizing that vendees are seen as mortgagors under Section 365(i). What about the debtor as vendee? We can take Countryman at face value and call the contract a lien, bypassing Section 365, but it will still be the same piece of paper, which under different circumstances, mandates special treatment to nondebtor vendees under Section 365(i).[20]

---

vendee has no lien under Section 365(j)). Indeed, special treatment for nondebtor vendees under Sections 365(i) and 365(j), coupled with the silence of the Code respecting debtor vendees, may cut against sellers. Nondebtor vendees, "shopping center leases, lessees in possession, and contracts to extend credit are all given special attention in Section 365." If debtor vendees were intended for treatment under Section 365, "a scrivener's pen was not wanting." *In re Summit Land Co., supra,* 13 B.R. at 315. Moreover, authorities have distinguished between contracts for deed which are marketing and financing instruments, with the former being "truly" executory and the latter not. *See, e.g.,* Osborne, Nelson and Whitman, Real Estate Finance Law 79 (1979); Lacy, *supra* at 480–481; *In re Mercury Homes Development Co.,* 4 B.C.D. 837, 837 n. 1 (N.D.Cal.1978). And "[u]nder English law, the trustee of a bankrupt vendee does not have to perform an executory contract of the bankrupt to purchase real property, but the trustee of a bankrupt vendor is required to perform an executory contract of the bankrupt to sell real property." Note, "Recent Decisions," 43 Va.L.Rev. 253, 255 (1957). *See generally* Note "Disclaimer of Contracts in Bankruptcy," 15 Modern L.Rev. 28 (1952).

20. The court believes that executory contract should be defined in light of federal not state law: "Where possible, the Code should be given a federal meaning. This permits uniformity in a national system; it promotes exegesis in line with bankruptcy policies." *In re Summit Land Co., supra,* 13 B.R. at 317. Countryman concurs that the characterization of the contract under state law should not control under bankruptcy law, *see* Countryman, *supra* at 456 n. 71 and 466 n. 106, but argues that "[t]he...unfairness in the treatment of vendees under land contracts as compared with purchase money mortgagors is not....the in-

*Second.* Consistency in the characterization of the contract leads to disparity in the treatment of the parties for other reasons. Where debtor is vendor, vendees are protected at least with a lien for the amount paid on the contract under Section 365(j). But where debtor is vendee, he has no protection under Section 365(j). Absent cure and adequate assurance of performance, he stands to lose, through forfeiture, his equity in the property. Likewise, debtor as vendor, under some circumstances, may sell the property free of liens. Thus, unencumbered proceeds, or encumbered proceeds for which adequate protection is provided, may underwrite operations pending workout of a plan, or fund a plan. But debtor as vendee may have no similar option.[21] He must find

cash to cure and supply adequate assurance of performance before he may assume the contract. And assumption is a condition to assignment of the contract.

The upshot is that nondebtor vendees, by virtue of Sections 365(i) and 365(j), may receive more favorable treatment in bankruptcy than debtor vendees. And debtor vendors, because of other policies and provisions in the Code, may fare better than debtor vendees. It may be argued that this disparity in treatment is warranted because of the risk of default when debtor is vendor,[22] or because the nondebtor, in each instance, is an innocent victim. But this argument admits that the reasons for calling a contract "executory" may have less to do with the terms of the "paper" than with

exorable product of a distinction between executory and nonexecutory contracts under the Bankruptcy Act. It is, rather, the result of unfair treatment imposed by state law..... [T]his is only because the bankruptcy law now confines the vendee on the vendor's bankruptcy and the vendee's trustee on the vendee's bankruptcy to the vendee's rights under state law. It need not do so. It [the Bankruptcy Act] could be written to invalidate state-tolerated forfeiture provisions in private contracts." *Id.* at 473.

Application of state law, in this case, may undercut the position of debtor, since Utah views contracts for deed as contracts, not liens, and permits forfeiture except where the result would be "unconscionable," in which case restitution of payments may be granted. *See, e.g.,* Bodenheimer, "Forfeitures Under Real Estate Installment Contracts in Utah," 3 Utah L.Rev. 30 (1952); Note, "Recent Utah Developments on Forfeitures in Real Estate Contracts," 7 Utah L.Rev. 95 (1960); *Morris v. Sykes,* 624 P.2d 681 (Utah 1981); *Biesinger v. Behunin,* 584 P.2d 801 (Utah 1978); *Johnson v. Carman,* 572 P.2d 371 (Utah 1977); *Kay v. Wood,* 549 P.2d 709 (Utah 1976); *Fullmer v. Blood,* 546 P.2d 606 (Utah 1976); *Jensen v. Nielsen,* 26 Utah 2d 96, 485 P.2d 673 (1971); *Thompson v. Brewster,* 25 Utah 2d 93, 476 P.2d 177 (1970); *Weyher v. Peterson,* 16 Utah 2d 278, 399 P.2d 438 (1965); *Strand v. Mayne,* 14 Utah 2d 355, 384 P.2d 396 (1963); *Andreasen v. Hansen,* 8 Utah 2d 370, 335 P.2d 404 (1959); *Carlson v. Hamilton,* 8 Utah 2d 272, 332 P.2d 989 (1958); *Peck v. Judd,* 7 Utah 2d 420, 326 P.2d 712 (1958); *Cole v. Parker,* 5 Utah 2d 263, 300 P.2d 623 (1956); *Jacobsen v. Swan,* 3 Utah 2d 59, 278 P.2d 294 (1954); *Perkins v. Spencer,* 121 Utah 468, 243 P.2d 446 (1952).

Moreover, if state law were controlling, the right of vendor to hold title as security may not be an "interest in property" covered by ade-

quate protection. This is because the right of vendor to hold title as security, for certain purposes, and under the doctrine of equitable conversion, has been held to be an interest in the proceeds of sale and not an interest in the realty. *See e.g., Jelco, Incorporated v. Third Judicial District Court,* 29 Utah 2d 472, 511 P.2d 739 (1973); *In the Matter of the Estate of Willson,* 28 Utah 2d 197, 499 P.2d 1298 (1972); *Allred v. Allred,* 15 Utah 2d 396, 393 P.2d 791 (1964); and *supra* note 18, at 14.

21. *But see supra* note 16, at 13.

22. This argument may undercut the Countryman test as applied to contracts for deed, where performance may remain due on both sides, with the vendee making payments and the vendor delivering title. Where the debtor is vendor, his financial embarrassment underscores the risk of nonperformance and the delivery of title therefore is a material concern. Where the debtor is vendee, however, the bankruptcy context may render this risk immaterial. Most contracts for deed, and the instrument in this case, prohibit the vendor from encumbering the property in an amount exceeding the contract price. Thus if the vendor defaults, the vendee may protect himself by paying on the underlying lien and offsetting this amount against the contract price. Once the petition is filed, given the superior lien of the trustee, 11 U.S.C. Section 544, vendor cannot further encumber the property. Underlying lienors arguably are barred from foreclosure by the stay and certainly are subject to injunctive relief under 11 U.S.C. Section 105(a). These features of the Code, designed to marshal and preserve assets of the estate, reduce the materiality of delivery of title under the contract.

the status of the parties and their interests in light of bankruptcy policies.

## CONCLUSION

The court is reluctant to depart from a rule as workable as the Countryman test. But application of the rule in this case contradicts the reason for its existence. Classifying the contract for deed, where debtor is vendee, as a lien rather than an executory contract benefits the estate by enlarging the value of the estate and furthering the rehabilitation of the debtor. Sellers, as lienors, enjoy adequate protection. This is in harmony with the rationale for Section 365(i) and 365(j). The blessings and burdens of reorganization are fairly distributed between creditors and the estate.