**In re William F. McDANIEL and Janice F. McDaniel, Debtors.**

**Bankruptcy No. 87–02423–K41.**

United States Bankruptcy Court, E.D. Washington.

June 30, 1988.

Maurice Cooper, Spokane, Wash., for debtors.

Jay Johnson, Wenatchee, Wash., for Carmen and Leona Bliss.

## MEMORANDUM OPINION

JOHN A. ROSSMEISSL, Bankruptcy Judge.

### JURISDICTION

This court has jurisdiction of this matter pursuant to 28 U.S.C. Section 157. This matter is a core proceeding under 28 U.S.C. Sections 157(b)(2)(A) and (2)(G).

### FACTS

Debtors William F. McDaniel and Janice F. McDaniel in January, 1981, executed a contract to purchase improved commercial real estate from sellers Carmen L. Bliss and Leona Bliss. This contract was recorded in February of 1981. The property is located in Tonasket, Washington, and is known in that community as the Whitestone Building. The ground floor of the building presently includes four commercial storefronts on the street side, and six apartments in the rear. The second story of the building consists of ten additional apartment units.

The contract provided for a total purchase price in the amount of $210,000. Debtors paid $34,317 at closing[1] and agreed to pay the balance, including interest at the rate of 10 per cent per annum, in monthly installments in the amount of $1,500, together with a balloon payment in the amount of $25,000 due March 1, 1986. At closing, sellers executed a warranty deed and that deed was placed in escrow.

---

1. The down payment consisted of cash in the amount of $5,000 and a vendor's interest in a second real estate contract with a principal balance in the amount of $29,317.

The contract provided that significant incidents of ownership of the property were transferred to debtors. Debtors were entitled to immediate possession of the property and sellers assigned debtors the commercial leases and apartment rental agreements. In addition, debtors were responsible for taxes and assumed all economic risks of ownership of the property. The contract specified that upon default sellers immediately were entitled to send debtors a notice of forfeiture and that debtors' interest in the property would be terminated in the event all defaults were not cured within 30 days of the notice of forfeiture.

Shortly after purchasing the property debtors made several major improvements to the property and assigned their interest in the contract to Mid Valley Bank to secure the repayment of approximately $63,-000 borrowed to finance the improvements. Those improvements included the construction of some of the apartment units and the installation of new appliances, siding, windows, and wiring.

Debtors defaulted on their obligations under the contract when they did not make the balloon payment. Debtors continued, however, to make the monthly payments until March, 1987. Sellers, on April 27, 1987, served debtors with a notice of intent to forfeit debtors' interest in the property. Sellers also filed a state court proceeding seeking the appointment of a receiver. On July 13, 1987, the state court denied sellers' request for the appointment of a receiver, but ordered sequestration of all rents received after May 12, 1987.

Debtors on July 24, 1987, filed a petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C., Section 101, *et seq.* Sellers had not recorded a declaration of forfeiture by the time the petition was filed. Thereafter, sellers moved for an order directing debtors to assume or reject the contract, and alternatively, for either abandonment, relief from the stay, or for adequate protection. Subsequently, debtors filed a disclosure statement indicating their intention to remain in possession of the property and restructure their obligation to sellers. Specifically, debtors propose to commence paying sellers monthly installments in the amount of $1,700, including interest at the rate of 10 per cent per annum, and pay the contract in full within 15 years.

Debtors owe sellers principal in the amount of $173,000, accrued interest from March 5th, 1987, to April 30, 1988, in the amount of $19,951.19, and attorney fees as provided in the contract, estimated in the amount of $5,000, or a total in the amount of $197,951.19. In addition, debtors owe real estate taxes on the property for 1984, 1985, 1986, and 1987, in the approximate amount of $14,400. The 1988 real estate taxes are to be paid pursuant to an interim order.

## DISCUSSION

The first question to be dealt with in this case is whether a real estate installment sales contract should be treated as an executory contract under 11 U.S.C. § 365 or as a lien/mortgage security device.

The difference between the two types of treatment is significant. *See e.g., In re Pacific Express, Inc.,* 780 F.2d 1482 (9th Cir.1986). If the real estate contract is an executory contract under the Bankruptcy Code, the purchaser McDaniel must either assume or reject the contract. 11 U.S.C. § 365(d)(2). Assumption of the contract requires cure of the defaults, payment of damages, and adequate assurance of future performance of the contract terms. 11 U.S.C. § 365(b)(1). These conditions must be met promptly upon assumption of the contract. The contract terms can not be modified against the will of a contracting party. Assumption requires assuming the burdens of the contract along with the benefits. *In re Maine,* 32 B.R. 452, 455 (Bkrtcy.W.D.N.Y.1983).

If the real estate installment sales contract is treated as a security device, the often onerous burdens, which are a prerequisite to assumption of an executory contract, need not be met. A debtor need not cure the defaults in order to retain the property. Rather a debtor can modify, within the confines of the Code, the payment terms of the contract. In this pro-

cess a debtor can request that the court value the collateral which secures the obligation and supply the creditor with a payment stream which has a current value equal to the value of the collateral. 11 U.S.C. § 1129(b). Any deficiency between the value of the collateral and the total amount of the creditors claim becomes an unsecured claim and is treated as such under the Code. 11 U.S.C. § 506(a). In summary, it is easier for a debtor to retain the property in question if the real estate installment sales contract is treated as a lien/mortgage as opposed to an executory contract.

The question whether 11 U.S.C. § 365 applies to real estate installment sales contracts has been held in this circuit to be an issue controlled by federal law. *In re Cochise College Park, Inc.*, 703 F.2d 1339 (9th Cir.1983); *In re Alexander*, 670 F.2d 885 (9th Cir.1982); *In re Rehbein*, 60 B.R. 436 (9th Cir. BAP 1986).

This does not mean however that the issue should be resolved without any attention to state law. State law is significant if the real estate contract creates ownership interests or security interests in property.[2] As the Supreme Court stated in *Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979):

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping and to prevent a party from receiving a "windfall merely by reason of the happenstance of bankruptcy." *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 609. The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests, includ-

ing the interest of a mortgagee in rents earned by mortgaged property.

Thus, a three step analysis is required: (1) Under Washington law, what property interests, if any, are acquired by a purchaser under a real estate installment sales contract? (2) Under Washington law, does the seller under a real estate installment sales contract retain a security interest in the property? (3) Do Bankruptcy considerations require that real estate installment sales contracts be considered as executory contracts under § 365 of the Bankruptcy Code?

I

*Under Washington Law, What Property Interests, If Any, Are Acquired By A Purchaser Under A Real Estate Installment Sales Contract?*

■ Substantial confusion has plagued this issue over the years. An analysis of the evolution of the law in this area is essential to an understanding and resolution of the problem.

In an early case, Washington equated an ancestor of the real estate installment contract (a bond for deed) to an equitable mortgage. *St. Paul & Tacoma Lumber v. Bolton*, 5 Wash. 763, 32 P. 787 (1893). The purchaser made a down payment and was to pay the balance of the purchase price in installments. The purchaser took immediate possession. The seller retained title to the real estate but executed and delivered a bond which provided that when the purchase price was paid in full, a deed would be executed and delivered to the purchaser. The court found this to be essentially a mortgage, stating:

> Under the authorities, and in accordance with the rules of common sense, Bolton and wife stand in the same relation to the land and with Shannon and Cantara as if they had bought the land outright and taken a mortgage back for security. The bond is simply a different form of security which some people prefer to a mortgage; but its object is the

2. Additionally, the consequences of breach or failure to perform are state law issues. *In re Wegner*, 839 F.2d 533, 536 (9th Cir.1988); *In re*

*Cochise College Park, Inc.*, 703 F.2d 1339, 1348 n. 4 (9th Cir.1983); *In re Rehbein*, 60 B.R. 436, 440 n. 1 (9th Cir. BAP 1986).

same, and in equity the parties stand in exactly the same position, relatively, as if they had taken the other form of security.

"*There can be no sensible distinction between the case of a legal title conveyed to secure the payment of a debt and a legal title retained to secure payment.*" Jones on Liens, 1108. (Emphasis added.)

*St. Paul & Tacoma Lumber, supra,* 5 Wash. at 766, 32 P. 787.

A conflicting theme was introduced in the case law with the case of *Pease v. Baxter,* 12 Wash. 567, 41 P. 899 (1895). It involved a purchase of real estate over time with payments to be made in installments. The seller was to retain title until the purchase price was paid. The contract provided that time was of the essence, and that the seller upon default could elect to rescind the contract, keep the payments, reenter the premises and expel the purchaser. The purchaser argued that this contract constituted an equitable mortgage. The court disagreed, emphasizing that a forfeiture was provided for, that the seller on its "*mere*" option could rescind, and that "it was not left for the courts to determine the rights of the parties when once the vendor had elected to rescind." *Pease v. Baxter,* 12 Wash. at 571–72, 41 P. 899.

A bright line distinction between these conflicting authorities was suggested in the case of *Taylor v. Interstate Investment Co.,* 75 Wash. 490, 135 P. 240 (1913). This was an action to quiet title brought by the seller of real estate. The seller had retained title to the property, as the sale took the form of the bond for deed as used in *St. Paul & Tacoma Lumber v. Bolton, supra.* The court found this to be an equitable mortgage, and denied relief on the ground that the seller had mischosen her remedy. The bond contained no clause granting the power of forfeiture. If the seller had that power she could have sued for ejectment or to quiet title. Here, however, "clearly the transaction was a sale, with a retention of title by the vendors as a security." *Taylor v. Interstate Investment Co., supra,* 75

Wash. at 493, 135 P. 240. The purchaser had acquired an interest in the property and the only way that interest could be extinguished was by foreclosure of the lien and sale of the property.

Thus, if a contract created a property right, that right could be extinguished only by foreclosure. If no property right was created by the contract, it might be forfeited at the "mere" option of the seller. The existence of the forfeiture clause in the contract became critical to the analysis. Equally critical was the idea that the seller, as a result of the forfeiture clause, had the sole power *without intervention of a court or other formal process* to extinguish the purchaser's right since it was a "mere" contract right. If a property right was involved a much more elaborate process would be required, i.e., foreclosure and sale.

*Ashford v. Reese,* 132 Wash. 649, 233 P. 29 (1925), marks the triumph of the position that a real estate installment sales contract, containing a forfeiture clause, conveys no interest in property. The Washington Supreme Court, in the course of deciding which party to a real estate contract should bear the risk of loss of a building on the premises, ruled:

[W]e have consistently held in numerous cases that an executory contract of sale in this state conveys no title or interest, either legal or equitable, to the vendee....

*Ashford v. Reese, supra,* 132 Wash. at 650, 233 P. 29. If this was controlling authority today, it would require that this court find that the contract in question created no property rights or security interests. However, *Ashford* has been overruled. In doing so, the Supreme Court in *Cascade Security Bank v. Butler,* 88 Wash.2d 777, 567 P.2d 631 (1977), held that a purchaser's interest in a real estate contract constituted real property within the scope of the judgment lien statute. Justice Brachtenbach in the course of the decision chronicled the less than illustrious history of the *Ashford* ruling:

From its inception the doctrine of *Ashford v. Reese, supra,* has been criticized.

Schweppe, *Rights of a Vendee Under an Executory Forfeitable Contract for the Purchase of Real Estate: A Further Word on the Washington Law*, 2 Wash. L.Rev. 1 (1926); Oles, *The Vendor–Purchaser Relationship in Washington*, 22 Wash.L.Rev. 110 (1947). Despite our failure to specifically overrule *Ashford*, we have distinguished it in so many ways that its sweeping language has become virtually meaningless.

We have identified the vendee's interest as "substantial rights," as a "valid and subsisting interest in property," as a "claim or lien" on the land and as rights "annexed to and are exercisable with reference to the land." *Oliver v. McEachran*, 149 Wash. 433, 438, 271 P. 93 (1928); *Griffith v. Whittier*, 37 Wn.2d 351, 353, 223 P.2d 1062 (1950); *Daniels v. Fossas*, 152 Wash. 516, 518, 278 P. 412 (1929); *State ex rel. Oatey Orchard Co. v. Superior Court*, 154 Wash. 10, 12, 280 P. 350 (1929).

These characterizations are patently at odds with the *Ashford* language. Additionally, we have held the vendee to have certain rights totally inconsistent with the concept that a vendee has no title or interest, legal or equitable. For example, we have held that: a vendee may contest a suit to quiet title, *Turpen v. Johnson*, 26 Wn.2d 716, 175 P.2d 495 (1946); under the traditional land sale contract, the vendee has the right to possession of the land, the right to control the land, and the right to grow and harvest crops thereon, *State ex rel. Oatey Orchard Co. v. Superior Court, supra;* a vendee has the right to sue for trespass, *Lawson v. Helmich*, 20 Wn.2d 167, 146 P.2d 537, 151 A.L.R. 930 (1944); a vendee has the right to sue to enjoin construction of a fence, *Kateiva v. Snyder*, 143 Wash. 172, 254 P. 857 (1927); a vendee's interest constitutes a mortgageable interest, *Kendrick v. Davis*, 75 Wn. 2d 456, 452 P.2d 222 (1969); a vendee is a necessary and proper party for purposes of condemnation proceeding, *Pierce County v. King*, 47 Wn.2d 328, 287 P.2d 316 (1955); a vendor's interest for inheritance tax purposes is personal property,

*In re Estate of Eilermann*, 179 Wash. 15, 35 P.2d 763 (1934); a vendor's interest for purposes of succession and administration is personal property, *In re Estate of Fields*, 141 Wash. 526, 252 P. 534 (1927); a vendee may claim a homestead in real property, *Desmond v. Shotwell*, 142 Wash. 187, 252 P. 692 (1927); a vendee is a real property owner for attachment purposes, *State v. ex rel. Oatey Orchards Co. v. Superior Court, supra* at 11–12 [280 P. 350].

Specifically we here hold that a real estate contract vendee's interest is "real estate" within the meaning of the judgment lien statute.

*Cascade Security Bank v. Butler, supra*, 88 Wash.2d at 781–782.

The Washington Supreme Court further clarified the nature of the real estate contract in the case of *Freeborn v. Seattle Trust & Savings Bank*, 94 Wash.2d 336, 617 P.2d 424 (1980). The court found that the right to payments under a real estate contract constituted personal property and that a security interest in such payments must be perfected under the requirements of the Uniform Commercial Code. Legal title, however, remained with the seller and a conveyance of that title must be recorded.

The State legislature has added a number of significant pieces of legislation in this area. In 1983, the judgment lien statute, RCW 4.56.190, was amended by adding the following sentence:

As used in this chapter, real estate shall not include the vendor's interest under a real estate contract for judgments rendered after August 23, 1983. (1983 Wash.Laws 1st Ex.Sess. Ch. 45 § 5)

This amendment relieves the contract purchaser of the burdens of dealing with the judgment liens obtained by the seller's creditors after the date of the real estate contract. *See Heath v. Dodson*, 7 Wash.2d 667, 110 P.2d 845 (1941).

In 1984, the legislature amended the recording statute, R.C.W. 65.08.060, by eliminating the exception for "an executory contract for the sale or purchase of lands"

from the definition of "conveyance".[3] Thus, real estate contract vendees are now entitled to the protection of the recording statutes.

It is clear that in recent years both the Washington courts and legislature have recognized that purchasers under real estate contracts acquire property interests in real estate. Clearly a purchaser's interest is much more than the "mere" contract interest referred to in the days of *Ashford v. Reese, supra.*

## II

*Under Washington Law, Does The Seller Under A Real Estate Installment Sales Contract Retain A Security Interest In The Property?*

 Having determined that under state law real estate installment sales contracts create property rights in the purchaser, this court now turns to an analysis of the nature of the seller's rights under such contracts. These issues are of course interrelated.

As we have seen, the purchasers acquired no rights in property either legal or equitable under *Ashford v. Reese, supra.* That ruling was premised on the existence of the forfeiture clause and the seller's right by his sole action to cancel the purchaser's rights. *Sleeper v. Bragdon,* 45 Wash. 562, 88 P. 1036 (1907). The existence of such unfettered authority did not give rise to a property interest but created a mere contract right. The courts of the State of Washington almost immediately recognized this as a harsh rule and began to use their equitable powers to soften its impact.

The law ultimately developed along the following line: If the contract contained a forfeiture clause and a "time is of the essence" clause, the seller on default could give notice of an intent to declare a forfei-

ture of the contract as proscribed in the contract. If the purchaser failed to cure within the time specified in the contract, the seller could forfeit the purchaser's interest by declaring a forfeiture. Theoretically, this would terminate the purchaser's interest. However in the typical case, the purchaser would refuse to surrender the property or had encumbered the property in some way. Thus, the seller would be required to resort to the courts to obtain possession through an ejectment action or to clear title through a quiet title action. In such actions upon the purchaser's request, the court would invariably give the purchaser a grace period to either pay the amount in default or more frequently to pay the outstanding balance on the contract, and thus protect his interest in the property. This grace period varied on the facts of the case, but was commonly six months. If the contract was forfeited the seller could recover no deficiency. *See Washington Real Property Desk Book,* Vol. II § 47.43 through § 47.47, pp. 47–64 to 47–67.

Professor Linda Hume has pointed out that under this procedure "the installment contract is virtually identical in form to the common law mortgage." Hume, *Real Estate Contracts and the Doctrine of Equitable Conversion in Washington: Dispelling the Ashford Cloud,* 7 U. Puget Sound L.Rev. 233, 245 (1984). Under the common law mortgage, title was transferred to the mortgagee on the condition subsequent that the mortgagor would repay the loan by a certain day, i.e. the law day. If the mortgagor failed to pay by that day certain, the mortgagee's title in the premises became absolute. The courts of equity in England softened the result of this harsh rule (much as the Washington courts have softened the forfeiture provisions of real estate contracts) by creating the concept of equity of redemption. Under this

---

3. This exception was adopted by the legislature following the *Ashford* decision. 1927 Wash. Laws Ch. 278 § 1 p. 670. The 1984 amendment removing the exception was sponsored by the Real Property, Probate and Trust Section of the Washington State Bar Association to resolve the uncertainties caused by the decision of *Reed v.*

*Eller,* 33 Wash.App. 820, 664 P.2d 515 (1983). In *Reed,* the court denied the protection of the recording statute to a purchaser under a real estate contract. The legislature eliminated the problem with the amendment. 1984 Wash. Laws Ch. 73 § 1.

concept, the mortgagor could redeem his land if he tendered the amount due including principal and interest within a reasonable time after the law day. The right of the mortgagor to come in, pay the debt, and regain the property created uncertainty as to the mortgagee's rights in the property. To relieve the threat of redemption, the courts of equity devised the foreclosure action. At the request of the mortgagee, the equity court would order the mortgagor to pay the obligation by a certain day. If the mortgagor failed to comply with this decree his right of redemption was barred forever. This process was known as strict foreclosure. Nelson & Whitman, *Real Estate Finance Law,* 2nd Ed. §§ 1.2 & 1.3, pp. 6–9 (1985).[4]

It is quite clear that this process of strict foreclosure closely parallels the judicial process created by the Washington courts to extinguish the purchaser's rights in a real estate installment sales contract. Hume, *supra,* at 245–249.

The law concerning real estate contract forfeitures was codified and clarified in 1985 with the adoption of the Real Estate Contract Forfeiture Act. RCW 61.30. Compliance with the terms of this act is now the exclusive process for forfeiture of real estate contracts. RCW 61.30.020.

RCW 61.30.010(1) provides the following definition:

> "Contract" or "real estate contract" means any written agreement for the sale of real property in which legal title to the property is retained by the seller as security for payment of the purchase price. "Contract" or "real estate contract" does not include earnest money agreements and options to purchase.

A summary of some of the salient provisions of the Act is appropriate. The Act requires that a notice of intent to forfeit, containing specific information, be recorded and served on the purchaser and upon all parties whose interests the seller desires to forfeit. RCW 61.30.070; RCW 61.30.050. The Act requires that this notice be given at least 90 days before the day upon which the contract may be forfeited. RCW 61.30.070. If during this period the purchaser cures the defaults and pays certain costs the contract will be reinstated according to its terms. RCW 61.30.090. If the purchaser fails to cure within the time allotted, the seller may record a declaration of forfeiture and the contract will be forfeited. RCW 61.30.100. This forfeiture cuts off the rights in the property of the purchaser and all parties claiming through him who received notice of the intent to forfeit. RCW 61.30.100(2)(a). The seller is entitled to retain the payments theretofore received by him on the contract. RCW 61.30.100(2)(b). All of the purchaser's rights in improvements and crops on the property are forfeited to the seller. RCW 61.30.100(2)(c). The seller is entitled to possession of the property ten days after recording of the declaration. The seller is barred from further claims against the purchaser (with the exception of waste after the 1988 amendments). RCW 61.30.100(3).

The purchaser, and those claiming through the purchaser, have a number of procedures available to protect their interests. First, they may bring an action to restrain or enjoin the forfeiture. To prevail in this action, the plaintiff must show that there is no default, that the purchaser has a claim against the seller which would excuse default, or that there is material noncompliance with provisions of the Act. In such an action, the court may extend the time for cure of defaults other than defaults arising from the failure to pay money. RCW 61.30.110.

Second, the purchaser, and those claiming through the purchaser, may bring an action to compel the public sale of the property in lieu of forfeiture. In this case,

---

**4.** A number of commentators and courts have suggested that the significant difference between a mortgage and a contract is the right of redemption. The mortgagor has a specific statutory right to redeem, while the contract vendee's request for relief from forfeiture is not specifically defined but rather granted at the court's discretion on a case by case basis. Note, *Bankruptcy and the Land Sale Contract,* 23 Case Western Reserve L.Rev. 393, 397–8 (1972). *See also, Rothenberg v. Follman,* 19 Mich.App. 383, 172 N.W.2d 845, 847 (1969); Gautier, *Real Property—Is A Contract For the Sale of Land A Mortgage?,* 16 U.Miami L.Rev. 493 (1962).

the court will order the sale if it finds the fair market value of the property exceeds the obligations secured by the contract and any other liens that would not be eliminated in the forfeiture. The order of sale is conditioned upon the party requesting same depositing the cash necessary to cover the costs of sale. If this requirement is met, the sheriff will conduct the sale. There are no redemption rights from this sale. RCW 61.30.120.

Both the actions to enjoin the forfeiture and the action to compel sale must be commenced before expiration of the time for cure (under the 1988 amendments, prior to the recording of the declaration of forfeiture). RCW 61.30.110(2); RCW 61.30.-120(2).

Third, the purchaser, and those claiming through the purchaser, may bring an action to set aside the forfeiture within 60 days of the recordation of the declaration of forfeiture. RCW 61.30.140(2). To prevail in such an action the purchaser must show that the rights of bona fide purchasers or encumbrancers will not be adversely affected, that the seller was not entitled to forfeit the contract, or that the seller did not materially comply with the requirements of the Forfeiture Act. RCW 61.30.140(4).

A review of these procedures for contract forfeiture show that they closely parallel those for non-judicial foreclosure of a deed of trust. RCW 61.24. As pointed out in the *Washington Real Property Desk-book*, Vol. II § 47.48, pp. 47–67:

> The forfeiture remedy under the Real Estate Contract Forfeiture Act is consistent with analogous procedures and limitations in mortgage foreclosures and nonjudicial trustee's sales although it incorporates existing practices, judicial precedent and common law specific to the real estate contract.

This similarity to a mortgage type instrument has been recognized by the Washington State Legislature. In 1988, the legislature amended RCW 61.30.020 by adding the following language:

> At the seller's option, a real estate contract may be foreclosed in the manner and subject to the law applicable to the foreclosure of a mortgage in this state.

Senate Bill No. 6143, Sec. 2, 1988 Regular Session.

The Real Estate Contract Forfeiture Act applies to all real estate contract forfeitures initiated after January 1, 1986. RCW 61.30.910. It applies to any forfeiture proceeding instituted by Blisses against the debtors. This court's review of the Forfeiture Act shows that it formalizes and codifies the case law treatment of the real estate contracts and practices existing before its enactment. As such it constitutes the most current statement of the law.

This analysis leads to the inexorable conclusion that Washington treats the seller's interest under a real estate installment sales contract as a lien/mortgage-type security interest in real property. Washington does not now, nor as has it for a long time, considered the purchaser's interest under a real estate installment sales contract as creating a "mere" contract right. The remedies provided to the seller in the case of breach or nonperformance are those of a secured creditor. Washington law considers the purchaser's interest under the real estate contract as a property interest and the seller's interest under that contract as a lien-type security device.

### III

*Do Bankruptcy Considerations Require That Real Estate Installment Sales Contracts Be Considered As Executory Contracts Under § 365 Of The Bankruptcy Code?*

Applying the analysis required by *Butner v. United States, supra,* the question now becomes whether some overriding federal bankruptcy consideration requires that the state's definition, categorization, and treatment of these rights be disregarded. Section 365 of the Bankruptcy Code deals with the treatment of executory contracts in bankruptcy. The Code does not define what is an "executory contract." The courts of the country do not agree on

whether a real estate installment sale contract is an executory contract under § 365.[5]

Almost invariably any judicial analysis of what constitutes an executory contract in bankruptcy starts with a discussion of the views of Professor Vern Countryman. This will be no exception. Professor Countryman's views on the subject are contained in his monumental article *Executory Contracts in Bankruptcy*, (Part I) 57 Minn.L.Rev. 439 (1973); (Part II) 58 Minn. L.Rev. 479 (1974). Countryman begins his discussion of the definition of an executory contract at page 450 stating:

> As Professor Williston has said, "All contracts to a greater or less extent are executory. When they cease to be so, they cease to be contracts." But that expansive meaning can hardly be given to the term as used in the Bankruptcy Act or even to the Act's occasional alternative reference to contracts "executory in whole or in part." The concept of the "executory contract" in bankruptcy should be defined in the light of the purpose for which the trustee is given the option to assume or reject. [Footnotes omitted.]

Having said this, Countryman proceeds to propound the following definition of an executory contract (at page 460) as:

> a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. [Footnotes omitted.]

Congress when it adopted the Bankruptcy Code in 1978 evidently had the Countryman definition in mind. The legislative history relating to § 365 contains the following statement:

> Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

S.Rep. No. 95–989, p. 58 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5844.

The Supreme Court in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1984), refers to this statement in the legislative history. Whether this reference constitutes an adoption of the definition by the Supreme Court is open to debate. *See In re Norquist*, 43 B.R. 224 (Bkrtcy.E.D. Wash.1984). The Ninth Circuit, however, has apparently embraced the Countryman definition. *In re Pacific Express, Inc.*, 780 F.2d 1482, 1487 (9th Cir.1986).

Countryman, having proposed the seminal definition of executory contract, goes on in his article to comment on whether a real estate installment sale contract is an executory contract within the terms of the Bankruptcy Act. Countryman observes:

> Certainly a contract under which the vendee still owes a material part of the purchase price and the vendor has not transferred title, and is not obligated to do so until that price if fully paid, is an executory contract. The fact that the

---

**5.** The following cases constitute a non-exhaustive survey of the cases on the issue.

(a) Cases in which real estate installment sales contracts were found not to be executory contracts under § 365: *In re Rehbein*, 60 B.R. 436 (9th Cir. BAP 1986); *In re Thurmond*, 46 B.R. 723 (D.C. Or.1985); *In re Faiman*, 70 B.R. 74 (Bkrtcy.N.Dak.1987); *In re Bertelsen*, 65 B.R. 654 (Bkrtcy.C.D.Ill.1986); *In re McCallen*, 49 B.R. 948 (Bkrtcy.Or.1985); *In re Britton*, 43 B.R. 605 (Bkrtcy.Mich.1984); *In re Cox*, 28 B.R. 588 (Bkrtcy.Idaho 1983); *In re Adolphsen*, 38 B.R. 776 (Bkrtcy.Minn.1983); *In re Patch Graphics*, 32 B.R. 373 (Bkrtcy.Wis.1983); *In re Booth*, 19 B.R. 53 (Bkrtcy.Utah 1982).

(b) Cases in which real estate installment sales contracts were found to be executory contracts under § 365: *Brown v. First National Bank in Lenox*, 844 F.2d 580 (8th Cir.1988); *In re Speck*, 798 F.2d 279 (8th Cir.1986); *Shaw v. Dawson*, 48 B.R. 857 (D.C.N.Mex.1985); *In re Henke*, 84 B.R. 693 (Bkrtcy.Mont.1988); *In re Scanlan*, 80 B.R. 131 (Bkrtcy.S.D.Iowa 1987); *In re Rancho Chamberino, Inc.*, 77 B.R. 555 (Bkrtcy.W.D.Tex.1987); *In re Buchert*, 69 B.R. 816 (Bkrtcy.N.D.Ill.1987); *In re Waldron*, 65 B.R. 169 (Bkrtcy.N.D.Tex.1986); *In re Anderson*, 36 B.R. 120 (Bkrtcy.Haw.1983).

vendee's payment go to an escrow agent rather than to the vendor, whether or not the agent is to apply them for the vendor's benefit prior to closing, does not seem to call for a different conclusion.

\*　　\*　　\*　　\*　　\*　　\*

The fact that the vendor as a part of the bargain has executed and placed with the escrow agent the formal documents necessary to effect a transfer of title likewise should not alter the result where the vendee is not entitled to have the transfer effected until payments are completed. [Footnote omitted.]

Countryman, *supra*, 57 Minn.L.Rev. at 469–470. In support of these conclusions, Countryman relies on two cases, *Gulf Petroleum S.A. v. Collazo*, 316 F.2d 257 (1st Cir.1963); *In re Swindle*, 188 F.Supp. 601 (Ore.1960). Significantly, neither of these cases involve real estate installment sales contracts; both involve contracts which were in the nature of earnest money or option agreements.[6] This is a critical distinction which when not recognized has hopelessly confused analysis in this area. As Professor Hume points out in her excellent elucidating article on this subject:

[C]onfusion results from the failure to distinguish between the installment contract, wherein seller retains legal title as security for performance, and the marketing or earnest money contract, wherein the parties intend that title will be transferred to the buyer after a short closing period. The installment contract resembles a mortgage because it divides the incidents associated with property ownership between the parties to the contract. Typically, however, the earnest money contract does not give any incidents of ownership to the buyer. Yet, in cases involving both kinds of contracts, courts often decide cases by ap-

plying property labels without considering relevant contract doctrine.

\*　　\*　　\*　　\*　　\*　　\*

Because the installment contract divides the incidents of property ownership usually associated with legal title between the parties to the contract, it should be treated differently than the earnest money contract in which the incidents of ownership are not divided.

Hume, *supra* at 234. Indeed, the Washington Legislature made this distinction when it excluded earnest money agreements and options from the coverage of the Real Estate Contract Forfeiture Act. RCW 61.30.-010(1).

Although not specifically acknowledging it, the appellate courts in the Ninth Circuit have applied this distinction in practice. In *In re Alexander*, 670 F.2d 885 (9th Cir. 1982), the court ruled that an earnest money type contract was an executory contract subject to assumption or rejection despite tender of full performance by the purchaser. The classic real estate installment sales contract has been found not to be an executory contract. *In re Rehbein*, 60 B.R. 436 (9th Cir. BAP 1986).

Significantly, the real estate installment sales contract in *Rehbein* appears to describe the exact contract terms which in Countryman's view constitutes an executory contract. The Bankruptcy Appellate Panel thus appears to have rejected Countryman's views on executory contracts as specifically applied to the real estate installment sales contract. However, Countryman's discussion of these issues, taken as a whole, suggest that his analysis was not intended to apply to situations where the purchaser actually acquired an ownership interest in the property. Rather his remarks should be limited to those contracts in which the purchaser obtained neither a legal nor equitable interest in the

---

**6.** In *Gulf Petroleum, supra,* the frustrated purchaser argued that the contract gave him an equitable interest in the land. The First Circuit rejected this argument, stating:

We need not determine the state of the Commonwealth law on these subjects, however, since the contracts between the parties, fairly construed, negative any idea that Gulf

was intended to have any interest in or lien upon the land prior to the closing under the contract and execution of the deed of conveyance.

*Gulf Petroleum, supra,* 316 F.2d at 260. The *Swindle* case involved assumption of an earnest money agreement.

property, as in Washington under there rule of *Ashford v. Reese, supra.* Countryman states that his research found no case in which a mortgage was treated as an executory contract. Countryman, *supra,* 57 Minn.L.Rev. at 472. Where the applicable non-bankruptcy law would treat the real estate installment sales contract as a mortgage, he suggests bankruptcy law should also treat it as a mortgage. *Ibid.* He attributes the Bankruptcy Act's alleged unfair treatment of contract vendees, as compared to the treatment of purchase money mortgagors, to the underlying unfair treatment imposed by state law. *Id.* at 473. As we have seen, the Washington courts and legislature have changed that treatment. Countryman does not suggest any overriding bankruptcy interests that require a real estate contract, which under applicable state laws has the significant characteristics of a mortgage, to be treated as an executory contract for bankruptcy purposes.

Judge Ralph Mabey, in the influential case of *In re Booth,* 19 B.R. 53 (Bkrtcy. Utah 1982), concluded that there are significant bankruptcy policies which *require* treatment of the real estate contract as a security device rather than an executory contract. Treating the real estate installment sales contract as a lien enlarges the value of the debtor's estate and facilitates rehabilitation of the debtor by making it easier for the debtor to avoid forfeitures and retain the property on favorable terms.

Lien treatment thus favors rehabilitation while treatment as an executory contract has the opposite effect. Guided by these controlling policy concerns, Judge Mabey ruled that where the debtor was a purchaser on a real estate installment sales contract, the Code required that the contract be treated as a security device rather than an executory contract. *In re Booth, supra,* 19 B.R. at 57. In reaching this conclusion, Judge Mabey found that the bankruptcy policies in favor of protecting the creditor's interest could be best treated under the adequate protection sections of the Code. *Id.* at 56–57. Judge Mabey's analysis on these policy considerations is persuasive.[7]

The strongest argument against Judge Mabey's conclusion in *Booth* is based on the actual language of § 365. A statement of this argument is found in the case of *Shaw v. Dawson,* 48 B.R. 857 (N.Mex. 1985). Congress made specific references in § 365 to instances in which under state law a contract for sale of real property would be treated as an executory contract. In § 365(i)(2), Congress provided that a non-debtor purchaser in possession of real property can retain possession, continue to make payments on the contract, and acquire title upon full performance of the purchaser's obligation despite the rejection of that contract by the debtor-seller. Section 365(j) provides that if a non-debtor purchaser under such a contract chooses to

7. Agreeing with Judge Mabey's analysis of these bankruptcy policy issues does not, however, suggest that this court adopts all of Judge Mabey's views as expressed in *Booth.* This court reluctantly expresses reservations concerning embracing that learned judge's analysis *en toto.* They are as follows:

(1) Judge Mabey rejects application of the Countryman definition of executory contract. That option is not available to this Court. The Ninth Circuit has apparently endorsed the Countryman definition. *In re Pacific Express, Inc.,* 780 F.2d 1482, 1487 (9th Cir.1986).

(2) Judge Mabey concludes that the determination of the issue should be solely a question of application of federal law without reference to the state statutes and case law. In reaching this conclusion, Judge Mabey conducted an extensive review of the Utah law. *In re Booth, supra,* 19 B.R. at 62–63, n. 20. He found that Utah law does not treat real estate installment

sales contracts as liens but rather as mere contracts subject to forfeiture without redemption as a matter of right. In other words, the Utah law appears to parallel in this respect the rule in Washington under *Ashford v. Reese, supra.* Judge Mabey was not forced to deal with the ruling in *Butner v. United States, supra,* because Utah law did not create either a property interest or a security interest. *Butner* teaches that state created property or security interests must be given deference unless confronted with a conflicting and compelling bankruptcy policy. The *Booth* decision suggests Judge Mabey found compelling bankruptcy policy reasons for overriding Utah law. Washington's treatment of these contract interests as liens is more compatible with the bankruptcy considerations expressed and relied upon in *Booth.* Thus, this court does not have to invoke the supremacy of the bankruptcy law to reach its conclusion.

treat the contract as terminated upon the debtor-seller's rejection of the contract, the purchaser retains a lien on the property as security for the portion of the purchase price already paid. Since Congress in these two instances provided exceptions for the treatment of non-debtor purchasers upon rejection of contracts for the sale of real property, the argument is made that Congress perceived that contracts for sale of real property would as a general rule be treated as executory contracts.

This court rejects that argument. If Congress intended that all contracts for the sale of real estate be treated as executory contracts it would have said so specifically. Sections 365(i) and 365(j) were drafted to prevent an injustice arising from the implications of the rule annunciated in *In re New York Investors Mutual Group*, 143 F.Supp. 51 (S.D.N.Y.1956). *See In re Booth, supra,* 19 B.R. at 55, 56. The *New York Investors* decision and its progeny suggested that upon rejection of an executory contract by the debtor-vendor the purchaser would lose its right in the real property it was purchasing and be left with only an unsecured claim for the portion of the purchase price already paid.[8] The §§ 365(i) and 365(j) exceptions were adopted to avoid that result.

Aside from those exceptions Congress has left the state law operative in this area. As was observed by the court in *In re Buchert*, 69 B.R. 816, 820 (Bkrtcy.N.D.Ill. 1987):

> Although Congress has expressed an overriding federal interest in certain executory contracts, i.e. collective bargaining agreements and the real property sales contracts when the debtor is the seller, there is no compelling federal interest to define the relationship of the parties to a real property sales contracts when the debtor is the contract purchas-

er other than as that relationship is defined under controlling state law.

Thus, § 365 does not require that real estate installment sales contracts be treated as executory contracts if that is contrary to state law.

There are a number of cases decided by the Appellate Courts in the Ninth Circuit that deal with whether contracts to sell real estate are to be treated as executory contracts. One of the earlier of these cases interpreting § 365 is *In re Alexander*, 670 F.2d 885 (9th Cir.1982). Alexander entered into an earnest money type agreement to sell her house to Benevides. Benevides paid $1,000 earnest money which was placed in escrow pending closing within sixty days. On the date set for closing, Benevides tendered the balance of the purchase price due under the contract, i.e. tendered full performance. Alexander, however, refused to close the deal by conveying title or surrendering possession. Benevides sued for specific performance. On the date set for trial in the state court, Alexander filed a Chapter 13 proceeding. In the Chapter 13 plan, the debtor rejected the earnest money agreement with Benevides as an executory contract. The bankruptcy court held the contract could not be rejected as executory because the purchaser had tendered full performance. The Court of Appeals reversed, stating:

> The contract did not cease to be executory when there was a tender of performance. Performance or the rendering of performance, not just tender of performance is required.

*In re Alexander, supra,* 670 F.2d at 887. The contract remained unexecuted on both sides and was thus subject to rejection.

It is clear from the facts of *Alexander* that the court was not dealing with a real estate installment sales contract such as we have in this case. The purchaser had not acquired, by conveyance or otherwise,

---

**8.** It should be noted that *In re New York Investors Mutual Group, supra, Gulf Petroleum, S.A. v. Collazo,* 316 F.2d 257 (1st Cir.1963), and *Matter of Philadelphia Penn Worsted Co.,* 278 F.2d 661 (3rd Cir.1960), which are generally cited as precedent for this rule, all involved real estate transactions in the nature of earnest money

agreements rather than real estate installment sales contracts. Thus, the enactment of §§ 365(i) and 365(j), to avoid the results in these cases, lends no support for the conclusion that Congress intended that all real estate installment sales contracts be considered executory contracts notwithstanding contrary state law.

an interest in the property nor any indicia of ownership, such as possession. Because of these differences it is not controlling precedent on the issues before this court.

In the case of *In re Cochise College Park, Inc.*, 703 F.2d 1339 (9th Cir.1983), the right to payments on real estate installment sales contracts made during the pendency of the bankruptcy proceeding depended on whether the contracts were treated as executory contracts under the old Bankruptcy Act. The Ninth Circuit decision that the contracts in question were in "all likelihood" executory was based on the fact that the seller had covenanted to improve the property as well as to convey title upon complete performance by the purchasers. *In re Cochise College Park, Inc., supra*, 703 F.2d at 1349. In dicta, however the court opined that a vendor's duty to deliver a warranty deed could be sufficient in itself to render the underlying contract executory in the bankruptcy sense.[9]

The *Cochise* ruling is clearly correct on the facts of that case. Cochise, as seller, had contracted to perform obligations substantially beyond delivery of a deed upon full performance by the purchasers. Cochise had platted several thousand acres of desert landscape in Arizona and launched a nationwide sales campaign promising to construct certain improvements necessary to the establishment of a residential subdivision. The improvements it was obligated to make included the construction of roads, streets, and facilities for water and electric-

ity. Cochise in 1972 filed a Chapter X proceeding under the Bankruptcy Act of 1898 before the improvements were completed; indeed, most of the improvements were hardly started. *In re Cochise College Park, Inc., supra*, 703 F.2d at 1345. The case illustrates the application of proper executory contract analysis to contracts involving obligations substantially unperformed by both parties to a contract. *See In re Wegner*, 839 F.2d 533, 536 (9th Cir. 1988); *In re Rehbein*, 60 B.R. 436, 440 n. 1 (9th Cir. BAP 1986).

Neither the ruling nor dicta in *Cochise* dictate the result here. In the first place, the real estate contract at issue in this case did not require the Blisses to perform any duties substantially beyond those of delivery of a deed.[10] In contrast, Cochise was obligated to construct certain improvements vitally necessary to the conversion of desert landscape into a habitable residential subdivision in addition to delivery of deeds. Second, the court's ruling in *Cochise* was specifically tailored to its displeasure with the conduct of the trustee.[11] Third, the case had been decided below on summary judgment and the actual terms of the numerous contracts were evidently not before the court. *In re Cochise College Park, Inc., supra*, 703 F.2d at 1346–1347. Finally, the statement in *Cochise* that the contracts were in "all likelihood" executory is supported only by cases involving earnest money type contracts rather than real

---

**9.** The Ninth Circuit stated:

> Moreover, even if each land sale contract did not include any promises by Cochise other than one to convey a deed and to release the mortgage (which seems unlikely), *Cochise's failure to deliver a warranty deed as promised (where such a deed had not been conveyed)*, to convey clear title (if required by the agreement), or to release the mortgage upon completion of payments could constitute material breaches of Cochise's obligations. [Emphasis added.]

*In re Cochise College Park, Inc.*, 703 F.2d 1339, 1349 n. 5 (9th Cir.1983).

**10.** Blisses argue that their unperformed duty to provide a bill of sale for the personal property makes the contract executory. Any reservation or retention of title by the seller of personal property is limited in effect to a reservation of a security interest. RCW 62A.2–401(1). In some

special circumstances the duty to provide a bill of sale may be a material obligation. *See In re Wegner*, 839 F.2d 533 (9th Cir.1988). This is not such a case.

**11.** The contest in *In re Cochise College Park, Inc., supra*, was over who, as between the trustee or the contract purchasers, was entitled to payments made on the contracts during the pendency of the Chapter X proceeding. The trustee had induced the purchasers to make post petition payments and attempted to deny them any recovery of those payments upon rejection of the contracts. Indeed, the court observed that the trustee's argument in one respect could be characterized as "disingenuous," *In re Cochise College Park, Inc., supra*, 703 F.2d at 1349 n. 5, and remanded the case for further proceedings against the trustee on allegations of fraud, *id.* at 1360.

estate installment sales contracts, such as issue here.[12] Indeed, the Bankruptcy Appellate Panel for the Ninth Circuit has not adopted *Cochise's* broad dicta. *In re Rehbein*, 60 B.R. 436 (9th Cir. BAP 1986).

In *Rehbein*, the court recognized that in substance the typical real estate installment sales contract constitutes a financing device indistinguishable from a mortgage. There, the trustee sold the debtor-vendor's interest in a real estate installment sales contract without notice to the vendee. The vendee petitioned the bankruptcy court to set aside the sale, but the court refused. Vendees appealed on the ground that the contract was executory and could not have been assigned without notice to them. *See* Bankruptcy Rule 6006(a) and (c).[13]

The panel determined that the real estate installment sales contract involved in that case did not constitute an executory contract on the reasoning that in substance the vendors, like a lender, were merely awaiting repayment of the purchase price:

> Contracts for Deeds are merely a financing arrangement for a sale which has already occurred. The vendor retains legal title only as security for the price. Since the deed was placed in escrow prior to the commencement of bankruptcy proceedings, the Debtor has fully performed.

*In re Rehbein, supra,* 60 B.R. at 440. A literal interpretation of this language would make the existence of an escrow determinative.[14] Such an interpretation is not justified. The *Rehbein* panel substantially relied upon *In re Adolphsen*, 38 B.R.

776 (Bkrtcy.Minn.1983), which held that a real estate installment sales contract should not be treated as an executory contract even where the vendor does not deliver a deed into escrow. The court emphasized the *Adolphsen* court's analogy of the duty of the vendor to deliver a deed in the future to the duty of a holder of a promissory note to surrender the note upon full payment. *In re Rehbein, supra,* 60 B.R. at 441. While citing *Adolphsen* with apparent approval, the Bankruptcy Appellate Panel makes no reference to the contrary position stated in the *Cochise* dicta, heretofore quoted in this opinion at note 9.

To distinguish real estate installment contracts based on the existence of an escrow artificially emphasizes the form of the transaction rather than its substance. This court sees no reason why the presence of an escrow in this type of transaction should trigger such radically different treatment under the Bankruptcy Code. *Cf. Countryman, supra,* 57 Minn.L.Rev. at 469, quoted above.

■ This court concludes that there are no compelling Bankruptcy reasons or precedents for overriding Washington's treatment of real estate installment sales contracts as security devices. The Ninth Circuit has ruled in the personal property lease situation that § 365 should not apply to agreements that are in essence security agreements. *In re Pacific Express, Inc.,* 780 F.2d 1482 (9th Cir.1986). This rule is equally applicable when dealing with real estate. As a result, this court finds that

---

**12.** *In re Cochise College Park, Inc., supra,* 703 F.2d at 1349 n. 7, *citing In re Alexander,* 670 F.2d 885, 886, 888 (9th Cir.1982); *Gulf Petroleum, S.A. v. Collazo,* 316 F.2d 257, 260 (1st Cir. 1963); *In re New York Investors Mutual Group,* 143 F.Supp. 51, 52 (S.D.N.Y.1956); *In re Philadelphia Penn Worsted Co.,* 278 F.2d 661, 662, 664 (3d Cir.1960).

**13.** Bankruptcy Rule 6006 provides:

 (a) PROCEEDING TO ASSUME, REJECT OR ASSIGN. A proceeding to assume, reject, or assign an executory contract, unexpired lease, or time share interest, other than as part of a plan, is governed by Rule 9014.

 \* \* \* \* \* \*

 (c) HEARING. When a motion is made pursuant to subdivision (a) or (b) of this rule,

the court shall set a hearing on notice to the other party to the contract and to other parties in interest as the court may direct.

**14.** *See also, In re Rehbein, supra,* 60 B.R. at 441, where the court stated:

 This Court does not hold that Contracts for Deed can never be executory. [Footnote referring to *In re Cochise College Park, Inc.,* 703 F.2d 1339 (9th Cir.1983) and *In re Alexander,* 670 F.2d 885 (9th Cir.1982) omitted.] We hold only that where the debtor has already placed the deed in escrow and has no other material obligations to perform, a Contract for Deed is not executory. [Footnote omitted.]

the contract between Blisses as sellers and the McDaniels as purchasers is not an executory contract under § 365 of the Bankruptcy Code.

## IV

*Should The Creditor Be Allowed Relief From Stay Or Adequate Protection?*

■ Having determined that the Bliss–McDaniel contract does not constitute an "executory contract," the court must now decide whether the sellers are entitled to relief from stay, or in the alternative, to adequate protection. The sellers seek this relief under 11 U.S.C. §§ 362(d)(1) and 362(d)(2).

To qualify for relief under § 362(d)(1), the party requesting relief must show "cause, including the lack of adequate protection." The court in analyzing this problem will focus first on the question whether the sellers "lack adequate protection." This problem requires an analysis of the amount of their claim, the value of the collateral, and the question whether the collateral is depreciating in value.

The Blisses' claim secured by this collateral is approximately $198,300.[15] After analyzing the evidence submitted herein, the court finds that the value of the Whitestone Building to be $219,000. In doing so, the court accepts the value placed on the property by Mr. Whitecar, the creditors' appraiser. Although both appraisal witnesses were creditable, the court was persuaded by Mr. Whitecar's superior background in appraisal of commercial properties and his more extensive experience and familiarity with property values in the Okanogan area in general and Tonasket in particular.

Debtors have not paid the real estate taxes on this property for the years 1983 through 1987, which total approximately $14,400. These taxes have priority over the Blisses' claim. Thus, net of taxes, the collateral available to pay the Blisses' claim is $204,600. This is 97% of the value of the collateral, yielding an equity cushion of 3%.[16]

The testimony at trial indicated that the property was not being properly maintained. This would add somewhat to the normal depreciation of the building. Although it is impossible to determine the exact amount of this physical depreciation, the court finds that the collateral is physically depreciating. In addition, the sellers' collateral position is deteriorating to the extent the debtors fail to pay the real estate taxes and other assessments on the property as they become due.

The task of valuing property is not an exact science. The margin of error can be substantial. In this case, it appears that the sellers have an equity cushion of only 3%, disregarding costs of sale if they chose to resell the property. This is not a sufficient equity cushion to protect them from the depreciation in the value of their collateral. The court concludes that sellers are not adequately protected.

■ The Blisses also assert that they are entitled to relief from the automatic stay "for cause." Consideration of this request for relief requires a close analysis of the facts.

Blisses are retired. They are dependent for their living expenses on the income from the McDaniel contract. In addition, they are burdened with substantial medical expenses which they are not currently able to pay.

The McDaniels had been making the $1,500 per month contract payments throughout the life of this contract. The

---

15. This figure was arrived at as follows: Principal balance $173,000, interest from March 1, 1987 through April 30, 1988 ($1,450 × 14 months) $20,300, plus estimated attorneys fees in the amount of $5,000.

16. If the Blisses chose to resell the property they would face additional costs of sale ranging from 7% to 10%. The Blisses would not incur these costs if they chose to keep the property as an income producer. Given the depressed nature of the economy in the Tonasket area this might be necessary in any event. If the property was retained by the sellers upon return, their claim would be fully secured. Resale by them would produce sales costs which make their claim undersecured.

debtors had missed the $25,000 balloon payment due in March of 1986, and since 1983, they had not paid the real estate taxes. In March of 1987, it became apparent that the Blisses would move to forfeit the contract. Mr. McDaniel testified at trial that faced with possible forfeiture and loss of the substantial investment in the property, he chose to cease making payments.[17]

The Blisses filed a notice of intent to forfeit on April 27, 1987, and instituted a state court action seeking appointment of a receiver. On July 13, 1987, the Okanogan Superior Court denied the request for appointment of a receiver but issued an order sequestering the rents from the property. On July 24, 1987, the McDaniels filed this proceeding under Chapter 11 of the Bankruptcy Code. During the course of this proceeding, the debtors have accumulated the rents, after deduction of operating expenses, in a separate account. As of May 13, 1988, these net proceeds totalled $19,-472.19.[18]

On September 8, 1987, the Blisses filed their request for assumption or rejection of the contract or in the alternative for stay relief or adequate protection. On September 23, 1987, McDaniels filed their objection to this request for relief. A preliminary hearing by telephone conference was set for November 9, 1987. Debtors' counsel objected to this hearing date on the grounds that he was still in the process of drafting a plan and that a pending settlement of a personal injury claim of Mr. McDaniel should be resolved before the matter could be heard. Despite the debtors' objection, the hearing was conducted as scheduled and the stay continued pending final hearing on January 4, 1988.

On December 23, 1987, debtors through their counsel filed a disclosure statement with an attachment which outlined terms of a plan. Under these terms, the debtors proposed to make a lump sum payment in the amount of the delinquent monthly payments "at the time the plan is approved." After confirmation the monthly payments due under the contract would increase to $1,700, with the balance of the contract to be paid off within 15 years.

On December 31, 1987, the debtors filed a motion requesting a continuance for the purpose "of allowing the creditors' committee to have the opportunity to analyze the plan and to make recommendations to this court." This motion for continuance was denied and the final hearing conducted. As of the date of this opinion, the disclosure statement has yet to be presented to the court for approval.

The court has found at least one case, *In re Andrews*, 17 B.R. 515 (Bkrtcy.C.D.Cal. 1982), which considered the financial needs of the creditor in granting relief from the automatic stay. In that case, the creditor was not in the business of making real estate loans, the debtor's failure to make payments had forced the creditor to the brink of financial ruin, and the debtor had acted with the intent to take advantage of the delay caused by the proceeding. *In re Andrews*, *supra*, 17 B.R. at 518.

The Blisses, like the creditor in *Andrews*, are not engaged in the business of making loans. The McDaniels' failure to make payments has placed a heavy burden on the Blisses. Although not all the delay in this proceeding can be attributed to the McDaniels, they are certainly responsible for a portion of it, and are in the position to take advantage of the Blisses vulnerability to delay. Indeed, during the course of this proceeding the debtors have voluntarily made all of their payments on their secured obligations other than those due to the

---

17. As down payment on the contract the McDaniels had paid $5,000 in cash and assigned a vendor's interest in a real estate contract with a principal balance of $29,317.00. They spent an additional $63,000 on improvements of the property.

18. The parties have not raised questions concerning whether the contract created an assignment of rents, the significance of the sequestration order, and the effect of the bankruptcy thereon. *See* R.C.W. 7.28.230; *In re Association Ltd. Partnership*, 87 B.R. 142 (Bkrtcy.W.D.Wash.

**878**

Blisses.[19] A number of these other obligations were to relatives of the debtors.

The Bankruptcy Code is a carefully drawn statute designed to harmonize the conflicting claims and aims of diverse parties to the reorganization process. The structure requires a balancing of the conflicting interests of the parties. Because of the circumstances of the Blisses, coupled with the inequity arising from the debtors' continued payments to all secured creditors except the Blisses, the court finds that there is "cause" for equalizing the burdens of this reorganization, which at the moment bear entirely too heavily upon the Blisses.

The equalization of those burdens however does not require that relief from the stay be granted. The evidence in the case reflects that the property is located in a very depressed market. Time may bring a rise in value which will allow the debtors to recapture some of their substantial investment. The debtors may be able to devise a plan which is confirmable. The court will afford them that opportunity upon certain conditions.

Based on the foregoing the court will order the following:

1. The Blisses' motion for an order requiring the debtors to accept or reject the real estate contract be denied;

2. The Blisses' motion for abandonment be denied;

3. The automatic stay remain in effect conditioned on the debtors payment of the sums specified in paragraphs 4 and 5 hereafter;

4. The debtors pay to the Blisses the sum of $12,000 for the period from September 1987, when they first filed their request for relief, through April 30, 1988.[20] These funds are to be paid from the funds held in the debtors' attorney's trust account;

5. Henceforth, the debtors pay to the Blisses during the pendency of this proceeding the sum of $1,500 per month, payable the first day of each month;

6. Within 45 days of the date of the filing of this decision, the debtors, having given all creditors the required notice, shall present to the court for its approval their proposed disclosure statement and plan; and

7. Within 45 days of the approval of a disclosure statement in this matter, the debtors shall have circulated the plan, concluded the voting process, and have the plan noted for confirmation.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Bankruptcy Rules. The attorneys for the Blisses are directed to prepare and submit a final order consistent with this opinion.

---

1988) *appeal pending; In re Johnson,* 62 B.R. 24 (9th Cir. BAP 1986); 11 U.S.C. § 552.

**19.** The debtors argue that they did not make payments to the Blisses for fear of forfeiture of those payments if they were ordered to assume the contract and were unable to do so. The

court has ruled that assumption of the contract is not required.

**20.** The court has previously ordered interim relief effective with the month of May 1988, through the entry of a final order in this matter.